**UNITED STATES of America,**
**Plaintiff,**

v.

**STATE OF ALABAMA; Wheeler Dyson, Cosby Johnson and Frank Smith, Registrars of Voters of Macon County, Alabama, Defendants.**

**Civ. A. No. 479–E.**

United States District Court
M. D. Alabama, E. D.

March 17, 1961.

John Doar, Acting Asst. Atty. Gen., D. Robert Owen, Ben Brooks, Attys., Department of Justice, Washington, D. C., and Hartwell Davis, U. S. Atty., Montgomery, Ala., for plaintiff.

MacDonald Gallion, Atty. Gen., Willard W. Livingston, Chief Asst. Atty. Gen., Leslie Hall, Gordon Madison, Asst. Attys. Gen., State of Alabama, and Robert P. Bradley, Legal Adviser to the Governor of Alabama, Montgomery, Ala., for defendants.

JOHNSON, District Judge.

This cause was heard by the Court, sitting without a jury, on the issues made up by the pleadings and proof. Upon consideration of the evidence (consisting of the oral testimony of over seventy witnesses, together with approximately 250 exhibits thereto) and the stipulations of the parties, this Court now makes and enters the appropriate findings of fact and conclusions of law, and, as authorized by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A., incorporates same in this memorandum opinion.

This action was brought by the United States as authorized by Part IV of the Civil Rights Act of 1957, as amended in 1960, 42 U.S.C.A. § 1971, and seeks to have this Court grant injunctive relief against acts and practices by the defendants which have deprived citizens of the United States, residing in Macon County, Alabama, of the right to register to vote without discrimination because of race or color.

The right to vote in Alabama is governed by both constitutional and statutory provisions.[1] This litigation does not involve the constitutionality of any of those laws.

Under the Constitution of Alabama, Section 178, registration is a prerequisite to voting at any election. In addition to the usual qualifications for registration, such as citizenship, age, and residence, applicants for registration must fill out a lengthy questionnaire, must be able to read and write any article of the United States Constitution which may be submitted to them by the registrars, and must be of good character and embrace the duties and obligations of citizenship. Registration is permanent in Alabama and a person once registered to vote is not required to reregister. The registration is conducted in each county by a board of registrars appointed by the Governor, Auditor, and Commissioner of Agriculture and Industries. Each board is to have three members, and the boards are authorized to make rules and regulations for the receipt and processing of applications and pass upon the qualifications of each applicant for registration.

Under the Civil Rights Act of 1957, as amended, and under the Fifteenth Amendment to the Constitution of the United States, the registrars of each county have a duty to conduct registration in a fair and reasonable manner without distinction of race or color. They also have the duty not to use procedures and practices which deny or abridge or tend to deny or abridge the right of any citizen to vote on account of his race or color. United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524, and United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535.

Macon County, Alabama, is divided into ten voting districts or beats. The population in Beat 1, wherein lies the city of Tuskegee, represents about sixty percent of the total population in the county. Seventy-five percent of the persons residing in Beat 1 are Negroes. The total population of Macon County is approximately 26,700, of which ap-

---

1. The provisions of the Alabama law that are pertinent to this litigation are set out in Appendix "A" to this opinion.

proximately 4,400 are white and 22,300 are Negro. There are approximately 2,800 white persons of voting age in Macon County, and approximately 11,-900 Negroes of voting age in the county. Less than ten percent of the Negroes of voting age are registered to vote, and virtually all of the white persons in the county are so registered.

The evidence in this case is overwhelmingly to the effect that the State of Alabama, acting through its agents, including former members of the Board of Registrars of Macon County, has deliberately engaged in acts and practices designed to discriminate against qualified Negroes in their efforts to register to vote. Such acts and practices have brought about and perpetuated the disparity between the relative percentages of Negroes and whites registered to vote. In general, these acts and practices vary from the total absence of a functioning Board of Registrars for extended periods of time [2] to the use of a double standard in receiving and approving applications for registration from Negro and white applicants. Such acts and practices reached a peak by the Board's "slowdown" tactics during 1960.

The double standard in receiving and processing applications of Negroes and whites has been applied by the Board of Registrars during the past five years in at least six different phases of the registration processes.

1. *The Order of Accepting Applicants*

The 1960 Board, consisting of Charles D. Scott and Wheeler Dyson, invariably made certain that the first applicants to take the time-consuming qualification tests were white applicants. For example, on June 20, 1960, seven white persons were given the first seven numbers on the "priority sheet". Most of these applicants arrived later than Negroes who were waiting near the

Registrar's office on the second floor of the courthouse. Such conduct, as well as being patently discriminatory, had the effect of precluding any Negro from applying for registration at the courthouse beat (Beat 1) until almost two months after the Board assumed office. Such discriminatory tactics were also practiced by Scott and Dyson in the outlying beats during July and August of 1960.

2. *The Assistance Rendered to White Applicants*

The majority of the Negroes in Macon County live and work in the Tuskegee beat, which is the site of Tuskegee Institute and the Veterans Administration Hospital. Many of these Negroes are associated with one of these institutions and a large majority of them have college or high school educations. The discrimination against these Negroes has been so effective that many have been unable to qualify as voters, while many white persons who have not even finished grammar school have been registered. The registrars E. P. Livingston, Grady Rogers, Wheeler Dyson, and Charles D. Scott, could not explain the standards that permitted such to happen. It is quite obvious to this Court that applicants such as Mayebelle S. Hickman, David Austin Haywood, Lela Berry, Bea Leek, Rosia Lee Stringfellow, Mary Lee Yarbrough, Jodie R. McGinty, Rupert McGinty, Ora M. Casaday, Junior Haywood, David Lewis, Edna Pearl Lewis, all white,[3] had received assistance in completing their forms. It is equally obvious that Negroes with high school and college educations who were rejected repeatedly for minor errors have not been given this assistance. While it is true that no applicant is entitled to assistance, it is not true that the law will permit assistance to whites, whether it be solicited or unsolicited, and the denial of

2. There was no functioning Board during the periods from: June 1946 to January 1948 (18 months); February 1956 to March 1957 (14 months); December 1958 to May 1960 (18 months); and January 1961 (1 month).

3. These are only examples; the applications introduced into evidence, together with the accompanying testimony, reflect that this was the general practice.

like assistance to members of the Negro race.

## 3. The Writing Test

Aside from the 1954–1955 period when no applicants were required to write provisions of the Constitution, Negroes were invariably required to copy a provision of the United States Constitution, and more often than not that provision was Article II. On the other hand, white applicants were often permitted to prove their ability to read and write by writing a shorter passage of the Constitution or by completing the application form without a writing test at all. Appendix "B" to this opinion sets out a list of 48 applications of white persons who were not required to take any writing test whatever; this appendix also sets out 17 applications of Negroes all of whom had to write an article of the Constitution and many of whom had to write Article II. These applications relate to the same period of time.

## 4. Grading Applications

The documentary evidence in this case is replete with examples of applications of Negroes who were rejected for registration because of some formal, technical and inconsequential errors in their application. On the other hand, white applicants whose forms also contain the same type of errors were registered. It is significant that only Negro applicants have been thus rejected.

## 5. Failure to Mail Registration Certificates to Negro Applicants

The conduct of the defendants was not limited to simply rejecting qualified Negro applicants. On many occasions when the Board of Registrars did act favorably, they failed to notify the applicant. In some cases certificates of registration were prepared but never sent to the applicant. Needless to say, an appeal from such a "denial" would probably have had the same result as the Mitchell appeal which was pending from this district several years ago; while that case was pending before the Court of Appeals, it was discovered that Mitchell had been registered all along.[4]

## 6. Non-Notification of Rejected Applications

Negro applicants did not receive notice of their rejection. Some witnesses testified they had applied as many as five times without ever having been notified of their rejection.[5] This practice existed in 1957 and 1958 and was still being continued in 1960. It is also significant to note that such a practice operated exclusively against Negroes, since no white applicants were rejected. The failure to notify the applicant leaves applicant with no information upon which to appeal, no evidence that he can vote, and without knowledge as to whether he should go and "sign up" again. Such a practice was for the obvious purpose of preventing Negroes from registering to vote.

The evidence in this case further shows that the defendant State and its agents, for the purpose of preventing Negroes from having the opportunity to register, have failed and refused to maintain registration facilities adequate to handle the registration of all unregistered eligible Negro citizens. On the other hand, sufficient registration facilities have been available to handle the registration of all unregistered eligible white citizens.

During the period of 1960 when there was a functioning Board of Registrars in Macon County, the defendants for the purpose of preventing Negroes in the Tuskegee area from applying for registration, deliberately devoted to the rural precincts (where said defendants knew the demand for Negro registration was slight) two-thirds of the time allotted to receive applications. This was done in the face of the knowledge on the part of the two board members, Scott and

4. Mitchell v. Wright et al., D.C.M.D.Ala., 69 F.Supp. 698.

5. See Appendix "C" which relates to the applications of Marie Williams and Carrie E. White.

Dyson, that the greatest demand for registration from prospective applicants was in Beat 1. See Appendix "D".

With such acts and practices in effective existence for several years, it was inevitable that a backlog of applicants develop; this is certainly true when only about ten percent of the total Negro population of voting age is registered. Instead of accelerating its pace, the Board in 1960 (operating for approximately seven months) only permitted 50 persons to complete applications for registration.[6] The registrars tender in explanation puny excuses such as lack of facilities, too much "paper work", and the handling of "transfers". This "slowdown" by the 1960 Board is evidenced by its selection of registration sites in rural areas, delays in processing applicants, the extremely long writing tests, and the processing of one applicant at a time. The contrast between the operation of the Board in 1960 and the operation of the previous Board on a single day—March 17, 1958—shows that the 1960 Board made no real effort to expedite the receipt of applications. On March 17, 1958, the Macon County Board of Registrars received approximately 40 applications at the courthouse.[7] The largest number received by the 1960 Board was five in one day.

The present Board of Registrars in Macon County is composed of the defendants Wheeler Dyson, Cosby Johnson, and Frank Smith, who were duly appointed as members of the Board of Registrars of Macon County and assumed the duties of their office in February of 1961. These defendants, for the evident purpose of continuing the racially discriminatory "slowdown" in Macon County, have failed to adopt any policies or procedures, or to take any actions to obtain additional facilities to accommodate the large backlog of prospective Negro applicants for registration in Macon County. As a matter of fact, the de-

fendants on the trial of this case, even after invitation from the Court, declined to put the defendants Johnson and Smith on the witness stand as their witnesses. The Court, in an effort to understand fully the attitude of the present members of the Board of Registrars in Macon County, called Johnson and Dyson as witnesses of the Court. Their lack of concern and their failure to take any action toward changing the pattern and practice of racial discrimination was fully evident from their testimony.

■ From the above, this Court specifically finds that the defendants for the past several years have engaged in acts and practices which have deprived Negro citizens of Macon County of their right to register and to vote without distinction because of race or color. Such deprivations have been pursuant to a continuing pattern and practice of racial discrimination practiced by the defendant State and the defendant registrars and their predecessors.

■ This Court concludes that it has jurisdiction of this action under 42 U.S.C.A. § 1971(d). This Court further concludes that the Attorney General of the United States is authorized to institute and prosecute this action on behalf of the United States pursuant to subsection (c) of 42 U.S.C.A. § 1971, for the purpose of obtaining relief against acts and practices by these defendants which deprive certain citizens of their rights and privileges secured by the laws and the Constitution of the United States.

This Court further concludes that the racially discriminatory acts and practices, such as (a) providing registration facilities sufficient to handle the registration of all unregistered eligible white persons, but insufficient to handle more than a token number of unregistered eligible Negroes, (b) permitting white applicants to apply for registration before Negro applicants, even though the

---

6. Of this group 32 were whites; 18 were Negroes. No white applicant was rejected; only 10 Negroes were registered.

7. Of the 40 applications received on March 17, 1958, 31 were white and all were accepted; 9 were Negro, 5 of which were accepted and 4 rejected.

Negro applicants arrive at the place of registration at a time prior to the arrival of white applicants, (c) assisting white applicants for registration, but rendering no such assistance to Negro applicants, (d) requiring Negro applicants for registration to read and write more lengthy provisions of the Constitution than white applicants are required to read and write, (e) permitting some white applicants to become registered without taking a reading and writing test, but requiring all Negro applicants to take such tests, (f) requiring Negro applicants to meet higher standards of accuracy in filling out their application forms than is required of white applicants, (g) registering white applicants despite errors in their application forms and rejecting Negro applicants making similar errors, and (h) rejecting highly qualified Negro applicants but registering white applicants less qualified or not qualified at all, are prohibited by the Fifteenth Amendment to the Constitution of the United States and by congressional statute, 42 U.S.C.A. § 1971 (a), when such acts and practices are based, as they are in this case, on race or color.

Such conclusion was clearly stated by the Supreme Court of the United States in Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 876, 83 L.Ed. 1281. In that case, the Supreme Court, in dealing with a scheme instituted by the State of Oklahoma in 1916 concerning the registration-to-vote system in that State, held that the scheme operated unfairly and unconstitutionally against Negroes as a class. It said:

"* * * The reach of the Fifteenth Amendment against contrivances by a state to thwart equality in the enjoyment of the right to vote by citizens of the United States regardless of race or color, has been amply expounded by prior decisions [citations omitted]. The Amendment nullifies sophisticated as well as simple-minded modes of discrimination. *It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race. * * *"* (Emphasis supplied.)

There have been countless other Fifteenth Amendment cases laying down and/or applying the same principle as the Supreme Court made so clear in Lane v. Wilson, one of the most recent cases being from this district, Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.

The evidence in this case is so abundantly clear in portraying the discriminatory acts and practices, which acts and practices clearly violate the Constitution and laws of the United States, that this Court is of the firm opinion that this case warrants not only a prohibitory decree but a decree mandatory in nature. The Civil Rights Act of 1957, as amended in 1960, was adopted to protect the right to vote in just such instances. To accomplish its purpose, the Congress of the United States authorized the courts to utilize the full equitable powers possessed by the Court. See United States v. McElveen, D.C., 180 F.Supp. 10, affirmed by the Supreme Court in United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535.

As a matter of fact, complete relief, in accordance with the intent of the Congress of the United States (as evidenced by the Civil Rights Act of 1957, as amended in 1960, and the congressional history of each of said acts) requires that the decree in this case be framed so as (1) to correct the effect of the Board's past discriminatory practices by placing certain Negroes on the voting rolls immediately, (2) to forbid the continuation of such discriminatory practices, (3) to insure the expeditious and nondiscriminatory taking and processing of applications by the Board of Registrars, and (4) to provide for supervision and possible expeditious enforcement of this Court's decree. In this connection, this Court specifically finds and concludes that the Negro citizens of Macon County whose names are listed on Appendix "E"

to this opinion were qualified by law to vote at the time of their respective applications for registration and the failure to register these Negro citizens was and is in violation of the Constitution and laws of the United States. The entering and the enforcement of such a decree will not have the effect of substituting federal administration of the registration processes for that of the State. The decree is for the sole purpose of establishing a standard which requires the defendants to be fair and to apply the laws as they relate to the registration to vote without racial discrimination; the decree that is to be entered also permits sufficient time to elapse before this Court considers making any judgment that the defendants are continuing to act in an unconstitutional and illegal manner. This Court, for the time being, is going to permit the registration of applicants in Macon County to be handled by the State officials that are charged with that responsibility under the law of the State of Alabama and the law of the United States. This Court, for the time being, declines the request of the United States that it appoint voting referees for Macon County, Alabama. Such a declination is made with the idea that the defendants can act fairly if the directions spelled out in this Court's decree are followed in good faith. If the defendants so act, they will have regained for Macon County and for the State of Alabama the integrity that the evidence in this case makes abundantly clear has been lost in this field of voting rights.

A decree will be entered in accordance with the foregoing.

### Appendix "A"

### Provisions of Alabama Law

Article VIII, Section 177 of the 1901 Constitution:

"Section 177. Every male citizen of this state who is a citizen of the United States, and every male resident of foreign birth, who, before the ratification of this Constitution, shall have legally declared his intention to become a citizen of the United States, twenty-one years old or upwards, not laboring under any of the disabilities named in this article, and possessing the qualifications required by it, shall be an elector, and shall be entitled to vote at any election by the people; provided, that all foreigners who have legally declared their intention to become citizens of the United States, shall, if they fail to become citizens thereof at the time they are entitled to become such, cease to have the right to vote until they become such citizens."

Amendment XCVI, amendment to Article VIII, Section 178 of the 1901 Constitution:

"Section 178. To entitle a person to vote at any election by the people, he shall have resided in the state at least two years, in the county one year, and in the precinct or ward three months, immediately preceding the election at which he offers to vote, and he shall have been duly registered as an elector, and shall have paid on or before the first day of February next preceding the date of the election at which he offers to vote, all poll taxes due from him for the two calendar years next preceding. Provided, that any elector who, within three months next preceding the date of the election at which he offers to vote has removed from one precinct or ward to another precinct or ward in the same county, incorporated town, or city, shall have the right to vote in the precinct or ward from which he has so removed, if he would have been entitled to vote in such precinct or ward but for such removal."

Amendment XCI, amendment to Article VIII, Section 181, Constitution of 1901:

"Section 181. The following persons, and no others, who, if they are citizens of the United States over the age of twenty-one years and

have the qualifications as to residence prescribed in section 178 of this article, shall be qualified to register as electors provided they shall not be disqualified under section 182 of this Constitution: those who can read and write any article of the Constitution of the United States in the English language which may be submitted to them by the board of registrars, provided, however, that no persons shall be entitled to register as electors except those who are of good character and who embrace the duties and obligations of citizenship under the Constitution of the United States and under the Constitution of the state of Alabama, and provided, further, that in order to aid the members of the boards of registrars, who are hereby constituted and declared to be judicial officers, to judicially determine if applicants to register have the qualifications hereinabove set out, each applicant shall be furnished by the board of registrars a written questionnaire, which shall be uniform in all cases with no discrimination as between applicants, the form and contents of which questionnaire shall be prescribed by the supreme court of Alabama and be filed by such court with the secretary of state of the state of Alabama, which questionnaire shall be so worded that the answers thereto will place before the boards of registrars information necessary or proper to aid them to pass upon the qualification of each applicant. Such questionnaire shall be answered in writing by the applicant, in the presence of the board without assistance, and there shall be incorporated in such answer an oath to support and defend the Constitution of the United States and the Constitution of the state of Alabama and a statement in such oath by the applicant disavowing belief in or affiliation at any time with any group or party which advocated the overthrow of the government of the United States or the state of Alabama by unlawful means, which answers and oath shall be duly signed and sworn to by the applicant before a member of the county board of registrars. Such questionnaire and the written answers of the applicant thereto shall be filed with the records of the respective boards of registrars. The board may receive information respecting the applicant and the truthfulness of any information furnished by him. Those persons who have registered as electors under the Alabama Constitution of 1901 shall not be required to register again. Provided, further, that if solely because of physical handicaps the applicant is unable to read or write, then he shall be exempt from the above stated requirements which he is unable to meet because of such physical handicap, and in such cases a member of the board of registrars shall read to the applicant the questionnaire and oaths herein provided for and the applicant's answers thereto shall be written down by such board member, and the applicant shall be registered as a voter if he meets all other requirements herein set out."

Code of Alabama, Title 17, Section 26 as amended:

"The board of registrars in each county shall visit each precinct at least once and oftener if necessary between October first and December thirty-first, 1939, and each two years thereafter, to make a complete registration of all persons entitled to register, and shall remain there at least one half a day. They shall give at least twenty days notice of the time when, and the place in the precinct where they will attend to register applicants for registration, by bills posted at three or more public places in each election precinct, and by advertisement once a week for three succes-

sive weeks in a newspaper, if there be one published in the county. Upon failure to give such notice or to attend any appointment made by them in any precinct, they shall, after like notice, fill new appointments therein. The time consumed by the board in completing such registration shall not exceed thirty working days in any county, except that in counties having more than three hundred thousand population as shown by the last preceding census, the time shall not exceed seventy-five working days. The board of registrars in each county shall meet at the courthouse on the third Monday in January, 1940, and each two years thereafter and shall remain in session ten working days for the registration of voters. *During even numbered years, the board of registrars in each county, in its discretion, may visit any of the precincts of the county on such days as the board shall determine for the registration of voters; but the*

*time consumed in such registration of voters shall not exceed a total of twenty working days in any one calendar year. In the manner prescribed herein, the board shall give notice of the time when, and the place in the precinct where, they will attend to register applicants for registration."* (Emphasis supplied.)

Code of Alabama, Title 17, Section 27 (1):

"The board of registrars of every county of the state of Alabama shall be in session at the courthouse, or one of the courthouses, of their county on the first and third Mondays in each month for the purpose of registering all persons in the armed forces of the United States, Merchant Marine, Red Cross, and other affiliated organizations, stationed or serving outside the county of their residence, and all other persons otherwise qualified under the laws of the state of Alabama to register."

Appendix "B"

Examples of Discrimination in Writing Tests

Forty-eight applications of persons applying in October and November, 1957.

| Education— | |
|---|---|
| 7th grade | 1 |
| 8th grade | 3 |
| 9th grade | 2 |
| 10th grade | 4 |
| 11th grade | 2 |
| High School | 21 |
| 1 year college | 4 |
| 2 years college | 2 |
| 3 years college | 1 |
| College Degree | 4 |
| Public School | 1 |
| College | 1 |
| Business College | 2 |

Writing test—None

| Race of Applicants | Action by Board |
|---|---|
| All White | All Accepted |

Seventeen applications of persons applying in October and November, 1957.

| | | |
|---|---|---|
| Education—High School | | 5 |
| | 1 year college | 2 |
| | 2 years college | 2 |
| | College Degree | 4 |
| | Masters Degree | 3 |
| | Unknown | 1 |
| Writing Test—Article II | | 15 |
| | Article III | 2 |

| Race of Applicants | Action by Board |
|---|---|
| All Negro | Rejected—9 |
| | Accepted—8 |

Appendix "C"

Examples of Applicants Attempting Successive Registrations

Five applications of Marie Williams, July 5, 1957, July 10, 1958, September 1, and September 15, and November 10, 1958.

Education—3½ years of college.

The first application contains minor errors. The second application contains a minor error in question 1 and the error, discussed below, which she repeated in her next two applications. The third and fourth applications are perfect except that in answer to the question "When did you become a bona fide resident of Macon County", she answered, "November 1948". On the 5th application, she answered, "November 15, 1948" and it is otherwise perfect.

Writing test—Article II (5 times)

| Race of Applicant | Action by Board |
|---|---|
| Negro | 1st Application . . . . . . . . . . Rejected |
| | 2nd Application . . . . . . . . . . Rejected |
| | 3rd Application . . . . . . . . . . Rejected |
| | 4th Application . . . . . . . . . . Rejected |
| | 5th Application . . . . . . . . . . Rejected |

Five applications of Carrie E. White. May 19, June 16, July 7, August 15, and October 6, 1958.

Education—11th grade.

The first four applications contain minor errors. The fifth application is perfect.

Writing test—Articles V, III, II, II, and II, respectively.

| Race of Applicant | Action by Board |
|---|---|
| Negro | 1st Application . . . . . . . . . . Rejected |
| | 2nd Application . . . . . . . . . . Rejected |
| | 3rd Application . . . . . . . . . . Rejected |
| | 4th Application . . . . . . . . . . Rejected |
| | 5th Application . . . . . . . . . . Accepted |

Appendix "D"

The 1960 list shows the following registration statistics for Macon County, Alabama as of March 28, 1960:

| Beat | Whites | Negroes | Total |
|---|---|---|---|
| 1 | 1,228 | 1,083 | 2,311 (Tuskegee Beat) |
| 2 | 166 | 1 | 167 |
| 3 | 113 | 0 | 113 |
| 4 | 41 | 3 | 44 |
| 5 | 54 | 4 | 58 |
| 6 | 87 | 1 | 88 |
| 7 | 119 | 11 | 130 |
| 8 | 182 | 22 | 204 |
| 9 | 1,045 | 8 | 1,053 |
| 10 | 70 | 0 | 70 |
| | 3,105 | 1,133 | 4,238 |

Notice posted by the Board of Registrars showing the dates and places of meetings of the 1960 Board.

Beat 1—7 meetings—only 5 held
Beat 9—3 meetings
Other Beats—7 meetings

Appendix "E"

| | Name | Date of Application |
|---|---|---|
| 1. | Adams, Fidelia Jo Anne | August 4, 1958 |
| 2. | Cropper, James R. | November 17, 1958 |
| 3. | Dunham, Sylvia E. | August 4, 1958 |
| 4. | Johnson, Lena Hayden | November 10, 1958 |
| 5. | Mabson, Fred D. | November 10, 1958 |
| 6. | Morgan, Pauline L. | August 18, 1958 |
| 7. | Robinson, Walter | November 17, 1958 |
| 8. | Scott, K. Eaton | November 17, 1958 |
| 9. | Williams, Charles C. | November 10, 1958 |
| 10. | Williams, Marie S. | November 10, 1958 |
| 11. | Billes, Eugenia C. | January 20, 1958 |
| 12. | Davis, Rev. Jordan | October 7, 1957 |
| 13. | Davis, Lewellyn W. | July 2, 1957 |
| 14. | Lightfoot, Roberta | January 28, 1958 and July 8, 1955 |
| 15. | Mitchell, Corinne | October 21, 1957 |
| 16. | Nearror, Doris | August 18, 1958 |
| 17. | Rhodes, Ora Lee | March 17, 1958 |
| 18. | Turner, William, Jr. | July 18, 1960 |
| 19. | Wynn, Daniel Webster | July 2, 1957 |
| 20. | Turner, William | July 18, 1960 |
| 21. | Jeter, Rebecca | December 5, 1960 |
| 22. | Jeter, James | December 5, 1960 |
| 23. | Guice, Julia | December 5, 1960 |
| 24. | Guice, Hosia | December 5, 1960 |

Appendix "E"

| Name | Date of Application |
|---|---|
| 25. Adams, Darthula Lucretia | November 10, 1958 |
| 26. Baker, Johnny Lee | April 21, 1958 |
| 27. Birmingham, Luther M. | January 27, 1958 |
| 28. Brown, Willie E. | October 6, 1958 |
| 29. Buford, Kenneth L. | September 15, 1958 |
| 30. Bulls, Frances Kate | August 4, 1958 |
| 31. Busby, George C. | June 3, 1957 |
| 32. Campbell, Wilma J. | August 5, 1957 |
| 33. Carter, June B. | July 3, 1957 |
| 34. Chaney, Gloria P. | January 27, 1958 |
| 35. Chaney, Robert Lee | January 27, 1958 |
| 36. Davis, Mary E. | November 17, 1958 |
| 37. Davison, Leida R. | May 19, 1958 |
| 38. Donald Leotis K. | July 10, 1958 |
| 39. Dorn, Matthew Charles | February 3, 1958 |
| 40. DuBose, Rosa Lee | April 21, 1958 |
| 41. Ford, Imogene Morrow | July 3, 1957 |
| 42. Garrett, Lewis D. | August 19, 1957 |
| 43. Henderson, Betty F. | July 2, 1957 |
| 44. Howard, Juanita | March 3, 1958 |
| 45. Jackson, James | May 19, 1958 |
| 46. Jackson, John W., Jr. | January 28, 1958 |
| 47. Johnson, Estelle Mrs. | July 1, 1957 |
| 48. Johnson, Freddie | July 1, 1957 |
| 49. Jones, Clarissa L. | January 23, 1958 |
| 50. Jones, Ruth Evalyn | July 21, 1958 |
| 51. Junier, Artemisia J. | July 3, 1957 |
| 52. Magruder, John C. | October 6, 1958 |
| 53. McCaston, Lola | April 7, 1958 |
| 54. Milbry, Lelia Mae | November 17, 1958 |
| 55. Miller, Charles E. | August 4, 1958 |
| 56. Mindingall, Bettye J. | July 10, 1958 |
| 57. Perry, John E. | June 17, 1957 |
| 58. Philpot, Lavinia | May 19, 1958 |
| 59. Renfroe, Osie L. | April 7, 1958 |
| 60. Rivers, Jessie Lee | August 4, 1958 |
| 61. Simpson, Geneva J. | July 5, 1957 |
| 62. Thompson, John T. | April 7, 1958 |
| 63. Tyner, Robert Lee | April 21, 1958 |
| 64. Wynn, Lillian R. | July 1, 1957 |