UNITED STATES of America,
Plaintiff,

v.

Ellett R. DOGAN, Sheriff and Tax Collector of Tallahatchie County, Mississippi, et al., Defendants.

No. D-C-53-61.

United States District Court
N. D. Mississippi,
Delta Division.

Jan. 20, 1962.

John Doar, First Asst., Harrison J. Goldin, Atty., Civil Rights Division, for the United States.

George Payne Cossar, Sr., George Payne Cossar, Jr., Charleston, Miss., J. J. Breland, John W. Whitten, Sumner, Miss., J. Hamilton Caldwell, Charleston, Miss., for defendant Dogan.

J. J. Breland, John W. Whitten, Sumner, Miss., J. Hamilton Caldwell, Charleston, Miss., for defendant Harris.

Joe T. Patterson, Atty. Gen., Edward L. Cates, Asst. Atty. Gen., Dugas Shands, Asst. Atty. Gen., P. M. Stockett, Jr., Sp. Asst. Atty. Gen., for State of Mississippi.

CLAYTON, District Judge.

This action is for disposition on complaint as amended, answer thereto, plaintiff's motion for preliminary injunction with evidence taken at the hearing on said motion, and memorandum briefs of the parties who are concerned with said motion. Briefly plaintiff seeks a comprehensive temporary mandatory injunction which would require a county sheriff indiscriminately to permit any and all Negro citizens of his county to pay poll taxes under a continuing supervision of this court.

The complaint is bottomed upon § 1971 (a), Title 42, United States Code Annotated,[1] with a basic claim being therein

---

1. "§ 1971. Voting rights—Race, color, or previous condition not to affect right to vote.

"(a) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

made that there has been and is discrimination against Negro citizens of Tallahatchie County, because of race, in acceptance of payments for poll tax and the issuance of receipts therefor. Payment of poll taxes for two successive years next before an election is a prerequisite to voting in Mississippi,[2] except, that at age 21 a new voter is exempted and there is no liability for poll tax after age 60.

■ Plaintiff sought to combine in a single action with a single hearing the action of proceeding contemplated by sub-section (c)[3] of § 1971, Title 42, U. S.C.A. with the proceeding contemplated by sub-section (e)[4] of the same statute.

2. § 3160, Mississippi Code 1942, Recompiled.

3. "(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State."

4. "(e) In any proceeding instituted pursuant to subsection (c) of this section *in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a)* of this section, the court shall upon request of the Attorney General and after each party has been given notice and the opportunity to be heard make a finding whether such deprivation was or is pursuant to a pattern or practice. (Emphasis added.) If the court finds such pattern or practice, any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application therefor, to an order declaring him qualified to vote, upon proof that at any election tion or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. Such order shall be effective as to any election held within the longest period for which such applicant could have been registered or otherwise qualified under State law at which the applicant's qualifications would under State law entitle him to vote.

"Notwithstanding any inconsistent provision of State law or the action of any State officer or court, an applicant so declared qualified to vote shall be permitted to vote in any such election. The Attorney General shall cause to be transmitted certified copies of such order to the appropriate election officers. The refusal by any such officer with notice of such order to permit any person so declared qualified to vote to vote at an appropriate election shall constitute contempt of court.

"An application for an order pursuant to this subsection shall be heard within ten days, and the execution of any order disposing of such application shall not be stayed if the effect of such stay would be to delay the effectiveness of the order beyond the date of any election at which the applicant would otherwise be enabled to vote.

"The court may appoint one or more persons who are qualified voters in the judicial district, to be known as voting referees, who shall subscribe to the oath of office required by section 16 of Title 5, to serve for such period as the court shall determine, to receive such applications and to take evidence and report to the court findings as to whether or not at any election or elections (1) any such applicant is qualified under State law to vote, and (2) he has since the finding by the court heretofore specified been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. In a proceeding before

It is to be noted, however, that for the proceeding established by sub-section (e) there must have been, *before it is instituted*, a finding by the Court that a person has been deprived on account of race or color of a right or privilege secured by sub-section (a) of this same statute. Hence, when this point was raised preliminarily, this Court ordered that the evidence at the hearing on the motion

a voting referee, the applicant shall be heard ex parte at such times and places as the court shall direct. His statement under oath shall be prima facie evidence as to his age, residence, and his prior efforts to register or otherwise qualify to vote. Where proof of literacy or an understanding of other subjects is required by valid provisions of State law, the answer of the applicant, if written, shall be included in such report to the court; if oral, it shall be taken down stenographically and a transcription included in such report to the court.

"Upon receipt of such report, the court shall cause the Attorney General to transmit a copy thereof to the State attorney general and to each party to such proceeding together with an order to show cause within ten days, or such shorter time as the court may fix, why an order of the court should not be entered in accordance with such report. Upon the expiration of such period, such order shall be entered unless prior to that time there has been filed with the court and served upon all parties a statement of exceptions to such report. Exceptions as to matters of fact shall be considered only if supported by a duly verified copy of a public record or by affidavit of persons having personal knowledge of such facts or by statements or matters contained in such report; those relating to matters of law shall be supported by an appropriate memorandum of law. The issues of fact and law raised by such exceptions shall be determined by the court or, if the due and speedy administration of justice requires, they may be referred to the voting referee to determine in accordance with procedures prescribed by the court. A hearing as to an issue of fact shall be held only in the event that the proof in support of the exception disclose the existence of a genuine issue of material fact. The applicant's literacy and understanding of other subjects shall be determined solely on the basis of answers included in the report of the voting referee.

"The court, or at its direction the voting referee, shall issue to each applicant so declared qualified a certificate identifying the holder thereof as a person so qualified.

"Any voting referee appointed by the court pursuant to this subsection shall to the extent not inconsistent herewith have all the powers conferred upon a master by rule 53(c) of the Federal Rules of Civil Procedure [28 U.S.C.A.]. The compensation to be allowed to any persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

"Applications pursuant to this subsection shall be determined expeditiously. In the case of any application filed twenty or more days prior to an election which is undetermined by the time of such election, the court shall issue an order authorizing the applicant to vote provisionally: *Provided, however*, That such applicant shall be qualified to vote under State law. In the case of an application filed within twenty days prior to an election, the court, in its discretion, may make such an order. In either case the order shall make appropriate provision for the impounding of the applicant's ballot pending determination of the application. The court may take any other action, and may authorize such referee or such other person as it may designate to take any other action, appropriate or necessary to carry out the provisions of this subsection and to enforce its decrees. This subsection shall in no way be construed as a limitation upon the existing powers of the court.

"When used in the subsection, the word 'vote' includes all action necessary to make a vote effective including but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election; the words 'affected area' shall mean any subdivision of the State in which the laws of the State relating to voting are or have been to any extent administered by a person found in the proceeding to have violated subsection (a) of this section; and the words 'qualified under State law' shall mean qualified according to the laws, customs, or usages of the State, and shall not, in any event, imply qualifications more stringent than those used by the persons found in the proceeding to have violated subsection (a) of this section in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist."

for the temporary injunction be limited to the period of time during which the defendant, Ellett R. Dogan, has served as Sheriff and Tax Collector of Tallahatchie County, Mississippi. That period is from December 24, 1959, until now. Only the poll tax question and the operation of the offices of Sheriff Ellett R. Dogan, with respect to payment of poll taxes are directly involved at this time. However, at the close of the hearing, plaintiff moved ore tenus to amend his complaint to "conform to the evidence" and since has filed a motion to amend the complaint in certain particulars and this motion was sustained with order being entered accordingly, although it is quite clear that plaintiff sought by this amendment to again invade the province of the proceeding established by the aforementioned sub-section (e) in the area of "pattern and practice". And, although this was apparent when the motion to amend was sustained, this Court considered that the amendment could do no harm, since all parties understood that disposition of this motion for temporary injunction would be made upon the basis of subsection (c) only, and that the Court would not give any consideration, at this time, to the provisions of sub-section (e).

Plaintiff urges that if the proof sustains the allegations of discrimination, as aforementioned, with respect to poll taxes, then that this falls within the prohibitions of sub-section (a) (See Note 1). Defendants contend that this statute applies only to the physical act of voting as distinguished from the precedent acts, if any, which are required to qualify to vote. Considering only the language of the statute, there seems to be a reasonable basis for defendants' position, since it must be noted that "all citizens of the United States *who are otherwise qualified by law to vote * * * shall* be entitled to vote * * * without distinction of race * * *".* Plainly this statute says

simply that a citizen who meets the qualifications to vote, whatever they may be, shall not be denied the right to vote because of his race or color. This is the way the law reads without benefit of judicial engraftment or enlargement. But, with the view this court takes of the evidence presented, it is not now necessary to decide this question of law.

In its strongest light for plaintiff, the evidence shows that only four members of the Negro race ever came in to either of the offices of the Sheriff and Tax Collector of Tallahatchie County, Mississippi [5] about poll taxes during the time with which we are concerned. Of these four, only two were liable for the payment of poll taxes in order to qualify to vote. The other two were exempt from such payment since they were more than 60 years old.

The two who were so liable are the witnesses Kegler and Willis. There is some evidence to indicate that the witness Kegler went into one of these offices more than once to inquire about payment of poll tax. However, the weight of the evidence shows that these two went to the Sheriff's Office at Charleston only once and that was on December 15, 1961, separately and at different times. At these visits, they each inquired about paying poll taxes, but neither one of them furnished to the Deputy Sheriff and Tax Collector with whom they spoke, the information required by state law,[6] neither one asked for any assistance in supplying said information, neither one stated that they were there for the purpose of paying at that time poll taxes and neither one tendered or offered the two dollars necessary to be paid for such purpose. These efforts were superficial at best and did not, even from the testimony of these two witnesses, carry the hallmark of bona fide efforts in good faith to pay poll taxes. When these inquiries were made, each of these people were advised by the deputy with whom

5. There are two county seats in this county, and the Sheriff and Tax Collector maintains an office at each place—Charleston and Sumner.

6. § 9919.5, Mississippi Code 1942, Recompiled.

they spoke, to take the matter up with the Sheriff. Neither of these witnesses asked where the Sheriff was or when or where they could see him about this matter. It is significant that the visit of each of these witnesses to the Sheriff's Office was after the hearing on the motion for temporary injunction herein had been fixed for December 20, 1961.

After their visits to the Sheriff's Office on December 15, 1961, neither of these witnesses made any effort to see the Sheriff or make an appointment with him. In fact, the witness Willis encountered the Sheriff after his visit, but did not in any way mention or discuss the question of payment by him of poll taxes. Although both of these witnesses saw Sheriff Dogan personally from time to time, neither of them ever spoke personally to him at any time on the subject of poll taxes, although the witness Kegler testified that she did so in January or February, 1961.

Sheriff Dogan has been readily accessible and available to anyone who wished to see him personally during the entire period with which we are concerned.

When it was reported to Sheriff Dogan by his deputy with whom they spoke, that the witnesses Kegler and Willis were interested in paying their poll taxes, the Sheriff directed that poll tax receipts be filled out for each of them undated and unsigned and that these receipts be issued to these two witnesses when the two dollar tax was paid and when the witness Willis furnished the name of his voting precinct. He testified that the reason he issued these instructions was that he knew both of these witnesses were entitled to pay their poll taxes, but that he was doubtful about the correct precinct for the witness Willis.

Shortly after defendant Dogan became Sheriff and Tax Collector of Tallahatchie County, he issued instructions to his deputies to advise all Negroes who desired to pay a poll tax to see him personally. He testified that the reason he did this was because he had heard of investigations into voting matters in the county and he wanted firsthand, personal knowledge of all circumstances involved in any occurrence that might take place with regard to the payment of poll taxes by Negroes.

The evidence also shows that during the time with which we are concerned, anyone who came into either of the offices for the purpose of paying poll taxes would be issued a poll tax receipt by the deputies in charge of the office if the taxpayer was personally known to them as being qualified to pay poll taxes, or, in some cases, when the person was found to be so qualified from the poll tax records in the office. It also appears that a number of white people, who were not known personally to the deputies and who could not be identified from the records as having previously paid poll taxes, were referred to the Sheriff for his determination as to whether they were qualified to pay poll taxes or not.

Poll tax payments by mail were accepted by Sheriff Dogan's deputies when the person offering to so pay could be identified from the poll tax payment records in the office or when the person was known personally to the deputy to be qualified to pay poll taxes. Sometimes also husbands were permitted to pay poll taxes for wives and, perhaps, vice versa, when the deputy accepting the payment knew personally that the wife or husband, as the case might be, was qualified to pay poll taxes, or when this could be determined from the poll tax payment records in the office. There is no evidence that any Negro ever offered to pay poll taxes by mail. There is no evidence that any Negro ever offered to pay poll taxes for any other Negro.

On December 17, 1961, Sheriff Dogan issued instructions to his deputies that if any person, white or Negro, requested any of said deputies to sell him a poll tax receipt, the deputy was to ascertain from the records whether such person had previously paid a poll tax in Tallahatchie County, Mississippi, and, if so, the deputy would then sell such person a poll tax receipt; if not, the deputy, if he knew of his personal knowledge that the applicant was qualified to pay a poll

tax, could then sell such applicant a poll tax receipt, but, if he did not know of his personal knowledge that the applicant was qualified to pay a poll tax in said county, the deputy was then to obtain from the applicant information as to the age, residence, and voting precinct of the applicant and advise the applicant either to take the matter up with the Sheriff personally, or to come back to the Sheriff's Office within a few days, within which time the deputy would present the matter to the Sheriff for his determination.

The voting age population of Tallahatchie County, Mississippi, consists of approximately 5,099 white people and approximately 6,483 Negro people, but it is not shown how many of these are exempt from the payment of poll taxes as a prerequisite to voting. Approximately 14,000 names appear on the registration books of this county. These books are obviously in poor condition and have been poorly kept and maintained over a long period of time. They have been in use for many years and when the above mentioned population figures are compared thereto, it is at once apparent that they contain the names of many people who do not now live in this county. Some part of the earlier registrations show the race of the registrant, but the race of none of the registrants in later years can be determined from these books. Hence, they have little evidential value in a determination of the issues here. However, it is without dispute, in the evidence before this court, that there were not, at the time of the hearing, any Negroes in Tallahatchie County who had paid poll taxes during the tenure of Sheriff Ellett R. Dogan and who had been issued poll tax receipts therefor.

No Negro has ever requested Sheriff Ellett R. Dogan to sell him a poll tax receipt, and there is nothing in the evidence to indicate in any way why only two members of the Negro race who are liable for the payment of poll taxes in order to vote, have concerned themselves in any way with such payment during the time with which we are here concerned. The record is silent in that regard. It is obvious, however, that the reasons for this situation lie largely with the Negro citizens of this county. To say, on this record, that they are elsewhere would be to guess, conjecture or speculate.

A substantial portion of the white people have paid poll taxes in Tallahatchie County; 2,321 paid these taxes for the year 1959 and 2,141 paid such taxes for 1960. No primary elections were held in this county in either of those years.

Assuming that ⅓ of the voting age Negro population of this county are exempt from the payment of poll taxes, there then would be approximately 4,322 voting age Negroes who would be required to pay this tax in order to vote. Thus the two who expressed some interest, as aforementioned, in paying poll taxes would amount to about ½₀ of 1% of the non-exempt voting age Negro population. If these two had made proper, valid and bona fide efforts to pay their poll taxes, numbers or percentages would be unimportant insofar as the individual rights of these two are concerned, if this litigation was concerned only with their individual rights. But, when weighed in the light of plaintiff's allegations and claims of general discrimination, ½₀ of 1% falls almost into the realm of "de minimis". These facts cannot be said to show, by a preponderance of the evidence, that the claimed discrimination against Negro citizens generally does in fact exist in Tallahatchie County.

It is well also to note that agents of the Federal Bureau of Investigation, at the direction of plaintiff, began in May, 1961, the investigation which led to the filing of this action, but the complaint was not filed until November 17, 1961. The seven months delay is unexplained, but it negates somewhat plaintiff's claim that an emergency such as would warrant the issuance of a temporary injunction in fact exists.

 The law with respect to the factual situation which must exist in any

452

case to require the issuance of a temporary injunction of the type sought here is so generally understood that repeating it would serve no useful purpose. Suffice it to say that injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of individuals which may well exist without substantial reasons and may be absolutely groundless. It is clear, from the foregoing findings of fact, that not all of the requirements, if any, for the granting of such extraordinary relief have been shown to exist by the evidence presented.

Additionally, it is well to add that in the exercise of its judicial discretion, it appears best to this court that the parties concerned with this hearing await the hearing on the merits, when all available evidence may be fully presented and considered.

It must be said, therefore, as a conclusion of law that plaintiff is not entitled to any of the relief sought in the motion and prayer for a temporary injunction.

Order is being entered accordingly.