STATE OF ALABAMA et al., Appellants,

v.

UNITED STATES of America,
Appellee.

No. 19051.

United States Court of Appeals
Fifth Circuit.

June 1, 1962.

Dissenting Opinion June 22, 1962.

See also 171 F.Supp. 720.

**584**

MacDonald Gallion, Atty. Gen. of Alabama, Willard W. Livingston, Leslie Hall, Gordon Madison, Robert P. Bradley, Asst. Attys. Gen. of Alabama, Montgomery, Ala., for appellants.

Hartwell Davis, U. S. Atty., Montgomery, Ala., John Doar, First Asst. Civil Rights Div., Dept. of Justice, Burke Marshall, Asst. Atty. Gen., Harold H. Greene, David Rubin, D. Robert Owen, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case presents the question whether, under the Civil Rights Act of 1957,[1] as amended 1960,[2] in a suit brought by the United States, the District Court may affirmatively order the registration of specified Alabama Negro voters found by the Court to have been discriminatorily denied registration because of their race and color. Subsidiary to this basic question is the further procedural one of whether, assuming power to issue a mandatory injunction, the granting of such relief here worked a substantial, and wholly unpredicted change in the nature of the case being tried and the issues to be adjudicated.

After a trial comprising over nine hundred pages of testimony from 53 witnesses plus two huge boxes of documentary exhibits, the District Court found that the State of Alabama,[3] through its voting registrars for Macon County, had denied registration to, and hence disenfranchised, Negro applicants because of their color and race. United States v. State of Alabama, M.D.Ala.1961, 192 F. Supp. 677. See also 188 F.Supp. 759, M.D.Ala.1960.

As we point out in greater detail later, Alabama [4] does not challenge this finding of discrimination. Perhaps even more significant, it does not challenge the decree or any of its numerous and pervasive parts except in one respect. Its whole attack here is centered on the portion of the decree which affirmatively requires that registration certificates be issued to 54 specified Negro applicants. Thus, for the purposes of this case at least, Alabama acquiesces in the correctness of the decree which, after declaring all discriminatory practices unconstitutional and therefore prohibited, proceeds to require Alabama to do these things. Specific notice was first taken of the Tuskegee precinct (Beat 1) where violations were most marked. The decree requires that registration applications be received there on at least two days a month and that the hundreds of Negroes then on the appearance list be processed at the rate of at least six simultaneously. The decree then provides that the Registrars must hold regular voter applica-

---

1. 42 U.S.C.A. § 1971(a), (b), (c).

2. 42 U.S.C.A. § 1971(e) and (f).

3. The Civil Rights Act of 1960, § 601(c), 42 USCA § 1971(c), expressly authorizes suits against a State. The State of Alabama is therefore a party. Prior to this Amendment the District Court had dismissed this very cause for absence of defendants since all Registrars had resigned. 171 F.Supp. 720, M.D.Ala., 1959. We affirmed, 5 Cir., 1959, 267 F.2d 808.

Pending review in the Supreme Court, the Civil Rights Act of 1957 was amended and the Supreme Court held the Amendment effective as to this cause. It vacated the contrary judgments and remanded the case with directions to reinstate the action as to the State of Alabama. 1960, 362 U.S. 602, 604, 80 S.Ct. 924, 4 L.Ed. 2d 982. But the Supreme Court decided none of the questions now before us.

4. We use the term indiscriminately to encompass the individual Registrars as well.

tion days monthly processing, in regular and expeditious order, white and colored applicants in accordance with the appearance list to be maintained without racial discrimination. The Registrars may use racially nondiscriminatory writing tests of not to exceed 50 consecutive words from the Constitution. Registration applicants are to be notified within twenty days of the acceptance or rejection of the application and, where rejected, the exact reasons therefor. An elaborate continuous policing machinery is established. This is done by requiring a monthly report to the Court of the dates and places of holding voter registration, the name, race and date of every application received, the action taken by the Registrars, and the date the certificate of registration was mailed or notification of rejection sent. A copy of every notification of rejection is to accompany this monthly report. The decree also prescribes that voting records should be open to examination by agents of the United States. It then requires a monthly report by the United States Attorney covering much of the data called for in the report from the State.

It is therefore evident that the District Court thought it encumbent that the Federal Court, in many and varied ways, engage in a most detailed supervision of the day-to-day operation of voter registration. Moreover, neither the power to do so, nor the propriety of its exertion, is here challenged. This is itself a circumstance of some importance. In so stating, we mean no criticism of the State for its not urging objection here. We are the first to recognize that for tactical or strategic reasons, the State may have concluded that fire should be concentrated on the one target. At the same time the object of that attack— the mandatory affirmative order to register—is part and parcel of an intricate judicially constructed machinery to assure genuine, continuous nondiscrimination. That such far-reaching steps were needed imparts color and similar necessity to feature under attack.

For similar reasons, the facts, though now undisputed and unchallenged, warrant a brief summary. For they, too, will illumine the specific order on which the State levels its whole barrage. As with the terms of the order, we must take pains to make clear that no criticism of the State is intended for not directly challenging the fact findings. Courts do, and should, welcome the forthright and sharply defined submission of serious legal questions of the kind here posed without encumbering the process by factual or collateral disputes no matter how earnestly held. But the State's willingness to acquiesce in the District Court's findings does not make them any less facts. Nor does it conceal or shield them from scrutiny insofar as their very detail may reflect light and meaning and necessity on the particular weapon fashioned by the Judge to meet the challenge of such facts. As neat and comfortable as it might be to view microscopically the State's contention as a sterile question of law, neither the judicial process nor the meaning and purpose of the Civil Rights Acts as a means of effectuating the guarantees of the Fifteenth Amendment permit it. What the Judge ordered to be done must be measured in terms of what the Judge saw.

The problem has its genesis in racial discrimination. It concerns voters in Macon County, Alabama, the most populous portion of which is Tuskegee. The majority of Negroes in Macon County live and work in Tuskegee, which is the site of Tuskegee Institute and a large Veterans Administration Hospital. Many of these Negroes are associated with one of these institutions, and a large majority of them have college or high school educations. Of course Tuskegee is no stranger to governmentally directed racial discrimination. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. That effort— perhaps more massive and frontal—if successful would disenfranchise those few who had won the struggle of registration. Here we deal with those who wish to join that small band.

In the problem of racial discrimination, statistics often tell much, and Courts listen.[5] Here they are spectacular. With approximately 17% of the Macon County population being white, the balance, 83%, being Negro, less than 10% of the Negroes of voting age are registered while nearly 100% of the white citizens are.[6]

The evidentiary details recited by both colored and white witnesses made it doubly clear that these statistics were not distorted. They demonstrate also that, for at least this time, these figures are reliable in their major implication that such disparity could not exist by chance alone, that there had to be causes for this result, and that a principal cause was conscious racial discrimination by those entrusted with the duty of impartial administration of law.

Registration is a prerequisite to voting in Alabama. Registration is permanent and re-registration is not required. Registration is by a Board of Registrars composed of three members appointed pursuant to state law. The qualifications of voters is set forth in the Alabama Constitution and implementing statutes.[7] In addition to the usual requirements of age, citizenship, residence, the applicant must fill out a lengthy questionnaire and demonstrate that he can read and write any Article of the United States Constitution. It is this machinery of administration which became the engine of discrimination.

What was done inevitably was measured by the District Court against what was undone. In that respect the most effective way to avoid certifying Negroes as qualified voters was to have no facilities by which the registration could take place. This, while having the nominal virtue of excluding white and Negro alike, did not work that way in view of the saturated registration of nearly all white adults, but only 10% of the Negroes. This situation prevailed for much of the recent past.[8]

And what was done likewise had to be measured against the manner in which it was done. The whole process was infected by an unsophisticated, patent, double standard. Here the obvious preferment of white applicants over Negroes in the physical routine handling of the procedure was more than an extension of social habits and customs of long standing. Here it effectively denied registration because it denied the opportunity to register.

The evidence was replete with instances in which a number of Negroes were the first to arrive at the place of registration. The Board, however, had white applicants arriving later sign the waiting list ahead of the position of the Negroes.[9]

Standing alone, and as irritating as that might be, this might sound quite trivial. But this was but a part of a pattern by which, with an occasional deference toward apparent equality, the

---

5. See, for example, in context of the composition of Petit and Grand Juries, United States v. Harpole, 5 Cir., 1959, 263 F.2d 71, and cases collected in footnote 13 at 77.

6. The 1960 lists showed 3105 white registrants but only 1133 Negro registrants out of approximately 11,900 Negroes of voting age. All but 50 of these were in the Tuskegee precinct (Beat No. 1).

   Art. VIII, Section 178, 1901 Constitution, Amendment XCI to Art. VIII, Section 181 Code of Alabama, Title 17, Section 26 as amended Section 27(1). The full text of the State law provisions is set out as Appendix A to the District

Court's opinion, 192 F.Supp. 677 at 683–685.

8. See note 2, District Court's opinion, 192 F.Supp. 677 at 679, which points out that "There was no functioning Board during the periods from: June 1946 to January 1948 (18 months); February 1956 to March 1957 (14 months); December 1958 to May 1960 (18 months); and January 1961 (1 month)."

9. This waiting list was referred to by witnesses and the District Court's opinion and order as the "priority sheet," see, e. g., 192 F.Supp. 677 at 679, and occasionally as the "appearance list."

grossest sort of inequality was being practiced. For in the critical stages of 1960, this tied into the deliberate slow-down. Again, this was done with all of the window dressing of solemn, pain-staking, deliberate consideration of a matter having the importance of voting.

Presumably because of intensified interest in securing voter equality, there was a great upsurge in the number of Negro applicants in 1960. In a brief period of time several hundred came to the registration places and put their names on the "priority sheets" (see note 9, supra). Of course, the easiest way of handling this was for the Board to be so occupied, ostensibly at least, that there would be no opportunity for many of these Negroes to proceed as far as the actual registration interview. This tactic was both crude and simple: white applicants were first on the priority list; the Registrars would not get to the many lower-listed Negroes because it would take so long with the white applicants. This process, of course called for patient, laborious, slow, time-consuming copying of very long articles of the United States Constitution by whites, as well as those few Negroes who worked up to the top of the list. Likewise, only one applicant was processed at a time, and no effort was made to handle a number of them simultaneously. This system really worked. So much so, that the maximum number ever processed by the 1960 Board in one day was five in contrast to eight times that in 1958.[10] And in total numbers processed, the Board for seven months in 1960 completed only 50 applications.[11] Indeed, the situation was so bad that on the trial numerous witnesses could make the arithmetical point that at the rate the Board was then "moving"—with approximately 18 Negroes getting as far as the registration desk per year—it would take over 20 years for the some 400 Negroes on the current priority sheet to get the actual opportunity to apply for registration.[12]

As though this discrimination was not enough to discourage or thwart effective Negro voter registration, the greatest disparity occurred in the substantive handling of applications of Negroes for whom, after working up to being face-to-face with the Registrar, the moment of truth had at long last arrived.

Though the Alabama Constitution prescribes that no assistance shall be rendered to applicants save for rare instances of physical infirmities,[13] the record showed two things in graphic parallel. On the one side was repeated assistance to specifically identified white voters, many of whom candidly acknowledged that his education and learning was insufficient to permit an intelligent understanding of the sometimes baffling questionnaire. Again, this might have been deemed trivial were it not for the fact that whereas white voters were given frequent assistance in determining the correct answers to unclear questions, Negroes not only failed to receive assistance, their applications were rejected for slight and technical errors in answers to just such very questions.[14]

10. Forty applications were received on March 17, 1958. Of these, 31 were white, 9 were Negro. All of the white applications were accepted, only 5 of the Negroes were accepted and 4 were rejected.

11. In 1960 (during the seven months it operated), the Board received approximately 50 applications at the Courthouse made up of 32 whites, 18 Negroes. No white applicant was rejected, nearly 50% of the Negroes were, as only 10 Negroes were registered.

12. Of course, a part of the slow-down system was the intentional allocation of a disproportionate amount of registration time to Precincts (Beats) other than Tuskegee and Beat No. 9. For example, as Appendix D to the District Court's opinion, 192 F.Supp. 677, 687, shows, Beats 1 (Tuskegee) and 9 had 3364 of the registered voters (Negro and white) for 1960. For these Beats registration days were held on only eight occasions, while for the remaining eight Beats comprising approximately 874 votes, seven registration meetings were held.

13. See Amendment XCI, amendment to Art. VIII, Sec. 181, Constitution of 1901.

14. Framing a questionnaire that will defy misunderstanding, misinterpretation, mis-

588

These and other practices led to the rankest discrimination as to grading. Numerous technical, insubstantial, minor errors were checked off in red as presumably the basis for nonissuance of voter registration even though no such treatment was accorded white applicants. More than that, many of these Negroes had undergraduate and postgraduate college degrees and held responsible positions at Tuskegee Institute or the Veterans Administration Hospital.[15] And to these crude efforts described by us in some detail must be added others found by the District Court to exist and not challenged here by Alabama.[16]

But what was undoubtedly the most disturbing thing of all to the trial Judge was not the recitation of past events which showed that as time went on things were getting progressively worse, not better. The disturbing thing was, rather, that there was not even a slight ray of hope that conditions would improve,

and that specifically, despite evident shortcomings in the past, the Registrars would now undertake to operate voter registration without conscious race discrimination. In the face of testimony which, word by word, witness by witness, convicted the Registrars of palpable discrimination, the Court was certainly right in thinking that it was actually, even if perhaps not technically, a part of the State's case to demonstrate a purpose to eliminate the past, and constitutionally insupportable, abuses. But where there should have been witnesses, there was silence. So much so, that after stating that he thought members of the current Board should be presented as State's witnesses, the State declined to put them on the stand, and the Judge had to call two of them as the Court's witnesses. From the lips of the two, the Judge could now see what others already knew,[17] that the past was more than the past. It was the future as well. The

application as to the question asked, or answers sought, is difficult if not well nigh impossible. Hence no criticism of the Alabama Supreme Court—responsible under the Constitution for preparing the questionnaire (see note 7, supra) — is expressed or meant. But much trouble was encountered with question 5 which read:

"5. If you claim that you are a bona fide resident of the State of Alabama, give the date on which you claim to have become such bona fide resident: ———.
(a) When did you become a bona fide resident of ——— County: ———
(b) When did you become a bona fide resident of ——— Ward or precinct ———."

Many white witnesses acknowledged that they did not know what this meant. On the other hand, time and time again rejected Negro applications showed red penciled error check marks for such errors as the omission of the exact date of the month at which time bona fide residence commenced, or discrepancy between birth dates (listed in question 1) and the evident 21st birthday where applicants equated bona fide residence with the status of adulthood, i. e. one no longer a minor.

15. As Appendix C to the District Court's opinion, 192 F.Supp. 677, 686, points out,

the climax was reached as to two Negro applicants.

In addition to these, the Government's brief correctly points to other vivid illustrations. Fifteen Negroes who testified applied for registration during the 1957–1958 period; three were registered on subsequent attempts. Of the twelve who had been unable to register, seven had completed at least one letter-perfect application form. One of these 12 had a Ph.D. degree, two had at least one year's work on a Master's Degree, three had B.S. Degrees, two had at least two years of college work, two were high school graduates, and two had at least two years of high school work.

16. These included disparity in the writing test by requiring copying of lengthy Articles of the Constitution, failure to mail registration certificates, failure to notify applicants of rejections and the like.

17. A Court, as Chief Justice Taft stated, would be blind not to see what "All others can see and understand." Bailey v. Drexel Furniture Co. [Child Labor Tax case], 1922, 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817. But "[T]here is no reason why [Courts] should pretend to be more ignorant or unobserving than the rest of mankind." Affiliated Enterprises v. Waller, 1 Terry 28, 1 Del. 28, 5 A.2d 257, 261.

Judge could see that the Board had neither plan nor purpose to eradicate these administrative evils.

It was in this setting—under the cumulative impact of gross abuses in the past and little expectation of improvement for the future—that the Judge was led to conclude "that this Court is of the firm opinion that this case warrants not only a prohibitory decree but a decree mandatory in nature." D.C., 192 F. Supp. 677 at 682. In the light of the Civil Rights Act of 1957, as amended in 1960, the Court went on, complete relief "requires that the decree in this case be framed so as (1) to correct the effect of the Board's past discriminatory practices by placing certain Negroes on the voting rolls immediately * * *," D.C., 192 F. Supp. 677, 682. Implementing this, the District Court's opinion called for the mandatory decree now under attack:

> "In this connection, this Court specifically finds and concludes that the Negro citizens of Macon County whose names are listed on Appendix 'E' to this opinion were qualified by law to vote at the time of their respective applications for registration and the failure to register these Negro citizens was and is in violation of the Constitution and laws of the United States." D.C., 192 F.Supp. 677, 682–683.

In the light of the circumstances of this record, briefly summarized by us, we are of the clear view that this order was within the power of the Court to grant, and that the exercise of that power was eminently proper.[18]

To support this conclusion we need search no further than the Civil Rights Act of 1957. In sweeping terms, subsection (a) affirmatively establishes a policy effectuating the Fifteenth Amendment that "all citizens * * * who are otherwise qualified by law to vote at any election * * * shall be entitled and allowed to vote at all such elections, without distinction of race, [or] color * * *." [19] The Act thereafter furnishes an adequate machinery for effective enforcement of this policy. As to subsection (a) rights, the Statute through subsection (c) prescribes that the "act or practice constituting a deprivation" of any such right "shall also be deemed that of the State and the State may be joined as a * * * defendant * * *." [20] The section earlier prescribes that "whenever any person has engaged * * * in any act or practice * * *" which would infringe subsection (a) rights the United States may institute "* * * a civil action or other proper proceedings for preventive relief, including an application for a permanent or temporary injunction, restraining order, *or other order*." [21] Moreover, subsection (d) uses strong and mandatory language in prescribing that the District Courts "*shall* have jurisdiction" of such proceedings and "*shall* exercise the same without regard to" exhaustion of administrative "or other remedies * * *." Cf. United States v. Wood, 5 Cir., 1961, 295 F.2d 772, 783.

This language points to several significant things. At the outset, the allowance of a direct suit against the State, as such, and the parallel substantive provision that discriminatory acts or practices shall be "deemed that of the State" plainly reveals that Congress was

---

18. As in the case of the other aspects of the decree and the fact findings of discrimination, the State does not undertake to challenge specifically the intrinsic merits as to the qualifications of these 54 Negroes ordered to be registered. The attack is on the basic ground that the Court could not enter such an order, no matter how positively established were the qualifications of the individuals named. Nevertheless, we have carefully reviewed each of the Applicants' questionnaires, etc., and readily conclude that the Judge had ample basis for his findings.

19. 42 U.S.C.A. § 1971(a).

20. 42 U.S.C.A. § 1971(c).

21. Emphasis supplied. Responsibility for such suits is expressly vested in the United States Attorney General.

acutely aware that the lawsuit would almost inevitably relate to many activities which are traditionally performed by, or for, the State as a true governmental function. The fact, then, that the administration of voter registration or other aspects of voter qualification ordinarily is, and should be, performed by State agencies, was not to be an obstacle to effective protection by the National Government of federally secured constitutional rights. Indeed, the established certainty that in some States these rights were being denied by State agencies led to the enactment of this Statute.

From this viewpoint the provision of subsection (d) was more than a promulgation of a procedural rule concerning exhaustion of remedies. In declaring that the Court "shall have jurisdiction" and "shall exercise" such power, Congress revealed again a purpose, where necessary, to interpose the Federal Court in the voter qualification process even though it meant supplanting successive elements in any State, administrative, judicial, or quasi judicial machinery for review of adverse actions. The Federal Court may—and perhaps must—take action on a showing of discrimination even though to do so effectually bypasses or dispenses with review by a State administrative or judicial tribunal. The occasional necessity of some such interruption of normal, ordinary processes was, therefore, contemplated and authorized by Congress. An order compelling a Registrar to register specified persons, if different, is so in degree only, not in kind.

And, perhaps even more decisive, Congress used broad language in describing the character of relief open to the District Court. The suit is described as a proceeding for "preventive relief."[22] This is spelled out in the traditional terms to include "permanent or temporary injunction" and restraining order. To make certain that effectuation of the policy of the Act should not be thwarted by any rigid limitations of even these elastic procedures, Congress expressly stated that relief available included such injunctions "or other order."[23]

■■ Mandatory injunctions affirmatively compelling the doing of some act, rather than merely negatively forbidding continuation of a course of conduct, are a traditional tool of equity. Long ago we said "an injunction may compel the performance of a duty." Loisel v. Mortimer, 5 Cir., 1922, 277 F. 882, 886. Certainly the order may command affirmative action where the enabling statute provides, as this one does, for the use of an injunction "or other order." Almost identical language as used here was held to justify an affirmative equitable order compelling the payment of money by way of restitution. Porter v. Warner Holding Co., 1946, 328 U.S. 395, 399, 66 S.Ct. 1086, 90 L.Ed. 1332.

■ In prescribing a suit to be brought by the sovereign for equitable relief, the statute contemplates that the full and elastic resources of the traditional court of equity will be available to vindicate the fundamental constitutional rights sought to be secured by the statute. Once Congress has vested jurisdiction of the cause in a District Court, such Court has, in the absence of statutory limitations, all of the traditional powers and facilities of a court of equity. Williamson v. Berry, 8 How. 495, 12 L.Ed. 1170; Sprague v. Ticonic National Bank, 1939, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. Where a federal statute establishes a general right to sue, "federal courts may use any available remedy to make good the wrong done." Bell v. Hood, 1946, 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939; Dooley v. United States, 1901, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074, see especially 228–230, 21 S.Ct. 762, 45 L.Ed. 1074. This may at times even require that a body of federal

---

22.  42 U.S.C.A. § 1971(c).

23.  The United States "may institute * * * a civil action or other proper proceeding for preventive relief, includ-

ing an application for a permanent or temporary injunction, restraining order, or other order." 42 U.S.C.A. § 1971(c).

substantive law be fashioned to effectuate the policy underlying the grant of jurisdiction. Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 451, 460, 77 S.Ct. 912, 923, 1 L.Ed.2d 972.

The aim of equity is to adapt judicial power to the needs of the situation. Thus relief in matters of public, rather than private, interests may be quite different from that ordinarily granted.[24] Though language frequently employed might be thought to place this result on the nature of the litigant—the sovereign or an agency of Government—it is really a manifestation of the principle that the nature of the relief is to be molded by the necessities. Porter v. Warner Holding Co., 1946, 328 U.S. 395, 397, 66 S.Ct. 1086, 90 L.Ed. 1332; Hecht Co. v. Bowles, 1944, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754. The necessities will encompass, of course, special statutory objectives. "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes.

As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to * * * give effect to the policy of the legislature.' Clark v. Smith [38 U.S. 195], 13 Pet. 195, 203, [10 L.Ed. 123, 127]." Mitchell v. DeMario Jewelry, 1960, 361 U.S. 288, 291–292, 80 S.Ct. 332, 4 L.Ed.2d 323.

Here the matter at stake is the fulfillment of a policy wrought out after extensive consideration of what Congress thought to be contemporary evils by States and agencies of States in the spurious, sometimes sophisticated, sometimes crude, practices by which Negroes were effectively denied the right to vote because of color and race alone. It was this evil which brought about the statute. It is inconceivable that in its enactment Congress meant by this broad language to grant less than effective judicial tools to combat it.[25] Especially is this so since Congress must have been aware that in the context of racial civil rights matters mandatory orders were being issued and approved in school desegregation cases requiring admission in accordance with specific plans.[26]

24. Judge Bootle in United States v. Raines, M.D.Ga., 1960, 189 F.Supp. 121, 134, phrased it thus:

"The plaintiff here is the United States of America, seeking to give effect to the broad remedial purposes of the Civil Rights Act of 1957. Where a sovereign state or nation is party plaintiff, it is sometimes more certainly entitled to specific relief than a private party might be. State of Georgia v. Tennessee Copper Co., 1907, 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038. Courts of equity frequently go much further both in giving and in withholding relief in furtherance of the public interest than they are accustomed to go where only private interests are involved. Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; United States v. McElveen, supra."

Judge Wright used much the same language in United States v. McElveen, E.D. La., 1960, 180 F.Supp. 10, 14, affirmed sub nom. United States v. Thomas, 1960, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535.

25. The legislative history certainly bears out the likelihood that affirmative manda-

tory orders have the effect of qualifying specified persons as voters would be both necessary and properly employed. See, e. g., testimony of Attorney General Brownell in hearings before the House Committee of the Judiciary, 84 Cong., 1st Sess. incorporated into Hearings on Civil Rights Before Subcommittee No. 5 of the House Committee on the Judiciary, 85 Cong., 1st Sess., pp. 571–572; also remarks during debates on the bill, 103 Cong.Rec. 12572, 12460.

26. See the following of many similar and more recent cases affirmatively requiring admission of Negro school children. See Pettit v. Board of Education of Harford County, Maryland, D.Md., 1960, 184 F. Supp. 452 (one pupil ordered admitted); Jones v. School Board of City of Alexandria, Virginia, E.D.Va., 1959, 179 F.Supp. 280, affirmed, 4 Cir., 1960, 278 F.2d 72 (eight pupils ordered admitted); Thompson v. County School Board of Arlington County, E.D.Va., 1958, 166 F.Supp. 529, affirmed sub nom., Hamm v. County School Board of Arlington County, Virginia, 4 Cir., 1959, 263 F.2d 226 (four pupils ordered admitted); Groves v.

In the face of this analysis, the prior decisions urged by Alabama are neither controlling nor persuasive. The most formidable, Giles v. Harris, 1903, 189 U.S. 475, 486, 23 S.Ct. 639, 47 L.Ed. 909, despite the somewhat celebrated dictum of Mr. Justice HOLMES that "the traditional limits of proceedings in equity have not embraced a remedy for political wrongs," does not stand in the way of the relief here granted.[27] As Lane v. Wilson, 1939, 307 U.S. 268, 272, 59 S.Ct. 872, 83 L.Ed. 1281, made clear, the setting and holding of Giles was unique as one in which a citizen, attacking a state voter qualifications statute as invalid, was simultaneously claiming a right to come under it. Moreover, as a decision emphasizing a supposed immunity to judicial action because of *political* characteristics of the controversy, the case falls under Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. To that may be added that Giles itself envisaged—as was done by Congress here —that "relief from a great political wrong * * *" is to "be given * * * by the legislative * * * department of the government of the United States," 189 U.S. at 488, 23 S.Ct. at 642.

The finding of no discrimination in both Ventre v. Ryder, W.D.La., 1959, 176 F.Supp. 90, 97, and Tullier v. Giordano, 5 Cir., 1959, 265 F.2d 1, 4, eliminates those decisions as irrelevant. That leaves only Byrd v. Brice, W.D.La., 1952, 104 F.Supp. 442, affirmed 5 Cir., 1953,

201 F.2d 664, and especially emphasis on the declaration of the District Judge that a "direct mandate [to register Negro voters] from [the court] would be usurpation * * * of the discretionary function of the registrar." While this decision could be distinguished on several grounds, we think it appropriate to state quite plainly that our affirmance of that judgment was not intended to, and did not, approve that language as such, nor commit this Court to the proposition that mandatory orders compelling affirmative action may never be entered against state voter registration officials to overcome established racial discrimination.

As to this phase of the case, we must deal with one further contention of Alabama. Whether stated independently or rather more as a persuasive reason why an affirmative decree is not permitted, Alabama seems to imply that the District Court is limited in the relief it may grant under the Civil Rights Act of 1957 to the remedies conferred by the Civil Rights Act of 1960. We adopt as sound the Government's answer refuting this contention.

The 1960 Act added a new subsection.[28] This subsection comes into play only upon a finding by the Court that persons have been deprived on account of race of subsection (a) rights, and that such deprivation was or is pursuant to a pattern or practice. Once such a finding is made, any other person of such race within the affected area is, upon his sub-

---

Board of Education of St. Mary's County, Maryland, D.Md., 1958, 164 F.Supp. 621, affirmed, 4 Cir., 1958, 261 F.2d 527 (one pupil ordered admitted); Thompson v. County School Board of Arlington County, Virginia, E.D.Va., 1957, 159 F. Supp. 567, affirmed, 4 Cir., 1958, 252 F. 2d 929, cert. denied 1958, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1065 (seven pupils ordered admitted); Moore v. Board of Education of Harford County, Maryland, D.Md., 1957, 152 F.Supp. 114, affirmed sub nom., Slade v. Board of Education of Harford County, Maryland, 4 Cir., 1958, 252 F.2d 291, cert. denied 1958, 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157 (two pupils ordered admitted); Allen v. School Board of City of Char-

lottesville, Virginia, W.D.Va., 1959, 4 Race Rel.L.Rep. 881 (twelve pupils ordered admitted).

27. By supplemental briefs Alabama has emphasized aspects of the legislative history. But the concern expressed by the Attorney General as to Giles v. Harris has to do, not with the power of the Court under the 1957 Act to enter an affirmative mandatory decree, but as to the use of voting Referees subsequent to a judicial declaration of a discriminatory practice. See Hearings on "Federal Registrars" before the Sen. Committee on Rules and Administration, 86th Cong., 2nd Sess., p. 359 and p. 51.

28. Subsection (e) to 42 U.S.C.A. § 1971.

sequent application, entitled to an order declaring him qualified to vote upon proof that (1) he is qualified under state law to vote, and (2) subsequent to such finding by the Court, he has been (a) deprived of the opportunity to register to vote or otherwise qualified, or (b) found not qualified to vote by any person acting under state law. The time element is important. For this provision *prospectively* governs persons found unqualified to vote *subsequent* to a judicial decree issued in a suit by the United States under 42 U.S.C.A. § 1971(c). Under its operation, this provision avoids relitigating the issue of racial discrimination with respect to each individual of the race found to have been the object of such discrimination.[29] This flows from the fact that this subsection permits the Court to declare an applicant qualified to vote merely upon proof that (1) he is qualified, and (2) subsequent to the Court's finding of a pattern or practice, such person has been found not qualified by the Registrar or has been denied the right to register.

Far reaching and as important as this subsection is, it does not govern the form of relief which the Court may grant with respect to individuals who, at the original trial of the section 1971(c) suit, are found by the Court (1) to have been declared unqualified to vote by the Registrar, (2) to have been so declared solely because of race or color, and (3) to be qualified. What Alabama overlooks in this argument is that as to these individuals, the judicial determinations stipulated in subsection (e) already have been made.[30]

▮▮ This brings us to the second and last contention of Alabama that by reason of this mandatory decree the actual trial was prejudicially expanded beyond the theory upon which the case was to be tried. In support of this, it is urged that there " * * * was never, at any stage of the proceeding, any indication that the case was being tried with the idea in mind that an ·Order might possibly be entered requiring the Board of Registrars to register named individuals. Such being the case, no opportunity was given to the Defendants to test the qualifications of the sixty-four individuals named in the order of March 17, 1961, at any stage of the proceeding."

There is neither technical nor substantial basis for this argument. It rests either on an unwarranted (and unrevealed) assumption in the minds of counsel for the State, or on a few isolated, disjointed bits of colloquy between Court and counsel. The formal complaint, which had precision and detail well beyond that required under the Federal Rules, carefully spelled out a prayer for just an affirmative order.[31] And the briefs before us now show that while the case was pending undetermined after completion of the testimony, the Government in its trial brief sought such

---

29. The contrast between voter applicants who have been witnesses or about whom testimony has been given, on the one hand, and those who are discriminated against subsequent to the initial § 1971 (c) suit was pointed out by the Attorney General's testimony. Hearings on "The Civil Rights Act of 1960" before the Senate Committee on the Judiciary, 86 Cong., 2nd Sess., p. 56. See also p. 76. Specific reference was made to the Terrell County (Georgia) case in which Judge Bootle ultimately entered the very kind of affirmative decree described in the hearings. United States v. Raines, M.D. Ga., 1960, 189 F.Supp. 121, 136.

30. The decree of the District Court expressly refrained, for the time being, from

invoking subsection (e) procedures including the appointment or use of voting Referees. As briefly summarized at the outset, the Court, rather than doing this, established enforcement procedures especially tailored to this case and as to which Alabama makes no challenge here.

31. The prayer in 11 numbered and lettered subparagraphs expressly sought an injunction enjoining the defendants from "failing or refusing to register the persons listed in 'Exhibit A' attached to this Complaint, *and others similarly situated*, and from permitting their names to remain off the current list of qualified voters in Macon County, Alabama." (Emphasis supplied).

an affirmative order. It is true, of course, that the case was not one whose immediate objective was the determination of the qualification or nonqualification of specific voters as such. But while the scope of the main relief sought transcended individuals demonstrated by the evidence to have been spectacular victims of racial discrimination, there was no legal basis for a claim of surprise that relief, otherwise proper, might be granted to individuals as well as classes.

More than that, the District Court was careful to give the State an actual opportunity to demonstrate why any one or all of the individual voters was not qualified. The initial order listed 64 voters, but in effect it gave the State ten days in which to show that any "one or more of said citizens have become deceased or possessed with some disqualification to register and vote since the date of their application or applications." The State did this as to 14 persons with the result that ten names were deleted upon the Court's finding that such persons "are not now qualified under the law of * * Alabama to be registered as voters in Macon County * * *."

Once it is recognized that this character of relief is within the Court's power to grant, the exercise of that power as to these 54 is not to be regarded as unusual or startling. Of these, approximately 16 had appeared as witnesses and as to all others, the Judge heard all that the Registrars had, or claimed to have had, before them as to the qualifications of these persons. The evidence concerning the general practice followed, that as to these 16 voter-witnesses, as well as the balance reflected by the voting application questionnaires demonstrated overwhelmingly that denial of registration could not be explained apart from racial discrimination. To put it another way: had there been no race discrimination as such, these persons would have been reg-

istered. Hence, the Court ordered what the Registrars should have done under their clear duty. This was subject, of course, to the right of the State to show that as to such specified discriminatees there were other and valid reasons for disqualification.[32] If Alabama had such evidence as to the 54 named, no effort was ever made to present it or request an opportunity to do so.

•Affirmed.

CAMERON, Circuit Judge (dissenting).

I.

In the civil rights case of Christian, etc. et al. v. Jemison et al., 5 Cir., 303 F.2d 52, this Court had before it the question whether a judgment which had been rendered by a Louisiana state court January 20, 1954, was *res judicata* of the Christian case. In enumerating the bases of its decision that the former judgment was not *res judicata*, this Court said, *inter alia*:

"But the reason that demonstrates its inapplicability most clearly to us is *the momentous change that has occurred in the field of constitutional law* since the adjudication of the first suit. * * * Three months after the judgment in the state court, the Supreme Court announced its historic decision in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 * * *. It was the Brown precedent that led to the decisions, previously cited, in which *segregation of local transportation facilities* had been declared unconstitutional. *In other related areas the law has been similarly transformed.*" [Emphasis added.]

Two months prior to the Christian decision, this Court had [1] taken like note of the momentous change, stating:

"Bearing in mind that the statute permits the application by the Attor-

---

32. The evidence overwhelmingly established that as to whites and Negroes, the Board acted solely on the basis of the sufficiency or insufficiency of the questionnaires. In testing voter qualification, the

Judge used exactly the same materials, no more and no less, but with one major difference: the Judge excluded race as a distinction.

1. Kennedy v. Bruce, 5 Cir., 298 F.2d 860.

ney General to be made without identifying the nature of the information upon which the Attorney General is acting, we simply make the observation that *in this day and age* an effort to inspect the records of a county having such a disparity in the percentage of voters to eligible citizens as between the races should not be frustrated by the simple expedient of the registrar's statement that there is nothing wrong." [Emphasis added.]

In the case before us the majority, seeking to discover the meaning of the statute involved, placed its reliance chiefly upon a series of District Court cases written by Judges from various portions of the nation who are well known exponents of the idea that, in deciding civil rights cases, the courts should ignore the teachings of history and should, as indicated in Christian, supra, accept as authority only cases decided since the Brown case.[2]  Taking note of this change in attitude towards constitutional construction, a dedicated and distinguished editor [3] wrote these words contemporaneously with the filing of Christian v. Jemison, supra:

"In Congress from 1913 to 1947 was a great American—Hatton W. Summers, Democrat, of Texas.  He died last week and was eulogized in the House as one of the greatest constitutional lawyers of all time.  He was for many years Chairman of the House Judiciary Committee prior to his retirement.  He had resisted as dictatorial the effort of President Franklin D. Roosevelt to 'pack' the Supreme Court.  In a book entitled 'The Private Citizen and his Democ-

racy,' published in 1959  *  *  * Mr. Summers wrote:

" ' *  *  * There is much to indicate that we have not escaped the mass governmental psychopathic disorders which are the outstanding characteristics of this period  *  *.

" 'May I repeat, the most alarming thing about our situation is the similarity of our attitude to that of the peoples of other times who, with closed eyes and deafened ears, moved to their own destruction.  They would not listen.  They would not look.  Nothing could turn them back.  The warnings of history, the admonitions of common sense they would not heed.  *  *  *'

"What we are witnessing today is a breakdown in constitutional government.  It began in the late 1930's when newly appointed Justices on the Supreme Court of the United States embraced the doctrine that *'the end justifies the means.'*  A school of thought arose which has held that the method of amending the Constitution stipulated in the document itself need not be employed if the judges interpret the law in the light of 'changing times  *  *  *'"  [Emphasis added.]

### II.

The majority here frankly defends its action in attributing to the words of a statute a meaning not contained in them, by embracing the thesis that the end justifies the means.  No question of fact is involved in the case before us—nothing but a question of law—whether the court below had jurisdiction under a statute to enter the mandatory injunction it did

---

**2.** The Christian and Bruce cases and the majority opinion here are the product of four Judges of this Court.  The "momentous change that has occurred in the field of constitutional law" may be traced, to a large extent, to four Justices of the Supreme Court who constitute the hard core of crusaders for this "momentous change."

(Nothing said in this dissent reflects in the slightest degree upon the integrity or sincerity of any of the Judges mentioned.  The words here used are directed solely at their philosophy of government.

**3.** David Lawrence in U. S. News and World Report, Vol. LII, No. 18, p. 112.

issue. The *appellants did not challenge the facts*, basing their argument entirely on the assumption that the court below correctly found all of the facts against Alabama. The majority opinion, nevertheless, justifies devoting half of its length to an exciting recital of the facts, by this statement:

"But the State's willingness to acquiesce in the District Court's findings does not make them any less facts. Nor does it conceal or shield them from scrutiny insofar as their very detail may reflect light and *meaning and necessity on the particular weapon fashioned by the Judge to meet the challenge of such facts.* As neat and comfortable as it might be to view microscopically the State's contention as a *sterile question of law*, neither the judicial process nor the meaning and purpose of the Civil Rights Acts as a means of effectuating the guarantees of the Fifteenth Amendment permit it. *What the Judge ordered to be done must be measured in terms of what the Judge saw.*" [Emphasis added.]

It has always been true that "hard cases make bad law." It is interesting to note that the Attorney General of the United States was acquainted with that fact and showed his reliance upon it in the testimony given by him in January, 1960.[4] Upon page 360 of the 700 page report of those hearings appears this colloquy:

"The Chairman, Mr. Attorney General, under the Civil Rights Act of 1957, how many suits if any have been instituted?

"Attorney General Rogers. Actually five or six. Two of them involved the Civil Rights Commission itself and four involved action which was started by the United States. * * * The other cases involved Terrell County, Ga.; *Macon County, Ala.:* one in Louisiana; and one in Tennessee. I might say on that point that it seemed wise to me to make certain that the test cases which we brought under that act, and I use the words 'test cases' because it was assumed that the first ones would all be challenged, and that we would make law in the first cases, that those test cases be very strong in their facts, *and we tried to be certain that those four cases which were started first would be strong so we could get the constitutional and other legal questions resolved with strong factual support.*

"Once those things are decided by the courts, and I hope they will be soon—I think they will be soon—then we can bring other cases with a little less concern about the complete strength of the facts in the case. * * *" [Emphasis added.]

The lengthy recital of the facts here by the majority will not, I apprehend, disappoint the gentleman who boldly made this forecast.

I do not subscribe to the thesis that the end justifies the means—that "What the Judge ordered to be done must be measured in terms of what the Judge saw." I think we have here a simple legal question which is well stated in the first sentence of the majority opinion,[5] so I do not advert to the majority's discussion of the facts. It is my conviction that, regardless of the facts, the court below was without jurisdiction to issue a mandatory injunction requiring the registration of fifty-four Negro applicants, and I will address my efforts to a discussion of this important question of

---

4. Hearings before the Committee on Rules and Administration, United States Senate, 86th Congress, Second Session, on a half dozen bills dealing with the general subject. Appearing on every page of the published report of those hearings is the heading "FEDERAL REGISTRARS."

5. "This case presents the question whether, under the Civil Rights Act of 1957, as amended 1960, in a suit brought by the United States, the District Court may affirmatively order the registration of specified Alabama Negro voters found by the Court to have been discriminatorily denied registration because of their race and color."

jurisdiction. This will be a task of no small proportions because, in view of the gravity of the holdings of the majority and the seriousness with which it argues them, a detailed discussion of the statutes upon which the United States relies and a tracing of those statutes back to their beginnings will be necessary, however reluctant many may be to give ear to the teachings of history in reaching such important conclusions.

### III.

First, we take issue with the majority statement that the court below was possessed of the power to enter the mandatory injunction it did enter, actually registering fifty-four Negroes, and the majority's assertion that "To support this conclusion we need search no further than the Civil Rights Act of 1957." The crucial words are found in 42 U.S.C.A. § 1971(c):

"* * * the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for *preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.* * * *" [Emphasis added.]

The italicized words seem to me to be so simple that even the uninitiated would doubtless wonder how an argument concerning their meaning could arise. The quoted words confer jurisdiction on the courts of the United States which had not theretofore existed. They vest certain powers in the Attorney General which he did not theretofore possess. They constitute a grant of power to the federal courts which, without them, they would not possess. It is too well settled to justify citing authority that the United States Courts are courts of limited jurisdiction, and that they have no jurisdiction except such as Congress bestows upon them.

The heading of subparagraph (c) reads:

"Preventive relief; injunctions; costs; State as party defendant."

It would seem that every lawyer and every educated layman would know that the grant of preventive relief encompassed only such relief as would stop somebody from doing something. Black's Law Dictionary, 4th Edition, page 923, contains this definition: "Preventive injunction. One which prohibits the defendant from doing a particular act or commands him to refrain from it."

The definition found in 43 C.J.S. Injunctions § 4, p. 408, is in these words:

"Preventive or Prohibitive or Prohibitory Injunction.

"A prohibitive or preventive injunction commands a person to refrain from doing an act and necessarily operates on unperformed acts and prevents a threatened but nonexistent injury.

"An injunction may compel a person to do as well as to refrain from doing, and injunctions are mandatory or preventive according as they command defendant to do, or to refrain from doing, a particular thing."[6]

The only jurisdiction lodged in the District Court by the 1957 Act was the power to entertain an action for preventive relief. Whether the mechanics by which the preventive relief was granted should be an injunction, a restraining order, or some other order, the scope of the order was, by the grant of power, limited to relief which was preventive.

The decree which the District Court entered and which is now before us for review contains several pages of preventive relief and quite a few items of mandatory relief, but the part of the decree we are testing at the moment does not grant any preventive relief at all:

"It is the further order, judgment and decree of this Court that said de-

---

6. The definition of Mandatory Injunction, as given in 43 C.J.S. § 5, p. 409, reads: "A mandatory injunction is an extra- ordinary remedial process which commands the performance of some positive act * * *."

fendants [officials of the State of Alabama] within ten days from the date of this decree place upon the current and permanent registration rolls, or any official copies thereof, the names of the following Negro citizens, unless one or more of said citizens have become deceased or possessed with some disqualification to register and vote since the date of their application or applications [names omitted].

"It is the further order, judgment and decree of this Court that the defendants within ten days from the date of this decree notify all the above-named citizens that their names have been placed upon the permanent registration rolls * * * [and] that the said defendants file with the Clerk of this Court within fifteen days from the date of this decree a report in writing reflecting their compliance with the above part of this decree. * * * "

An examination of the complaint shows that, in paragraph one, it was stated that the action was brought "to obtain preventive relief against acts and practices by the defendants * * * ;" and that every item of the prayers for relief is for preventive relief only. It is not intimated in any pleading that the United States was asking the court to order Alabama to register any applicant or to do anything except to refrain from acts of discrimination.

It is further clear from colloquys between court and counsel that nothing but a prohibitory injunction was sought. But I will not pause to set out any of those colloquys because they are of minute importance in comparison with the legal question of whether positive relief could be given by mandatory injunction under the statute relied upon by the majority.

It is important to bear in mind at every stage of the argument that the court below had no power at all to enter the order it did enter except the one statute quoted supra. The majority has strained hard, with the assistance of highly trained specialists brought into the case by the United States Government, to find some case which would justify the granting of positive mandatory relief commanding the defendants to do certain things in defiance of the action of Congress in limiting the relief provided in the Act to preventive relief; but it has failed completely in its effort to do so. The only case directly on the subject was decided by the District Court of the United States for the Western District of Louisiana, Byrd v. Brice, 1952, 104 F. Supp. 442, affirmed 5 Cir., 1953, 201 F.2d 664, wherein the District Judge wrote that he would not direct the registrar to register any one of the complainants in that case: "A direct mandate from us would be usurpation by us of the discretionary function of the registrar."

Considering itself commissioned to take the initiative in "fashioning a body of federal substantive law" to fit its concept of what Congress ought, or must have, intended the words used by it to mean, the majority has made a 'brave and brash start. The trouble is that Congress used language which is not susceptible of the construction the majority essays to place upon it, and Congress manifestly chose its words carefully in an effort to bring the statute within constitutional limitations.

The Supreme Court case most relied upon by the Government and apparently by the majority is Porter, Price Administrator v. Warner Holding Co., 1946, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332. The court there was engaged in applying the injunctive provisions of the Emergency Price Control Act. Those provisions were quoted by the court (p. 399, 66 S.Ct. p. 1089) thus: " * * * the language of § 205(a) * * * expressly authorizes the District Court, upon a proper showing, to grant 'a permanent or temporary injunction, restraining order, or other order.' " That statute does not restrict the relief to be granted to preventive relief. It grants the right to the court to issue every kind of injunction, both mandatory and prohibitory. The language of the statute conferring juris-

diction upon the District Court in Porter is, therefore, essentially different from the language of the statute granting injunctive power to the court in the case before us. Porter is no authority at all in this case, because the jurisdiction of the court there was not confined to preventive relief.

The majority adverts in general terms to the congressional history of the legislation as supporting its position; but it does not quote any of the legislative history. The chief quotation contained in the Government's brief is from the statement by Attorney General Brownell "of what could be done by way of the injunctive process under the proposal." The witness was describing certain alleged discriminatory acts as having been committed in the State of Mississippi. His reference to the use of the injunctive power is contained in this statement:

> "Now, we believe that if the Attorney General had the power to invoke the injunctive process that the registrar could have been ordered to stop these discriminatory practices and qualify these citizens according to Mississippi law without having to go to the criminal process."

It is plain that what the Attorney General was doing there was to compare the ease with which a registrar could be forced to refrain from discriminatory practices with the difficulties attendant upon resort to the criminal process.

The Attorney General testified in more definite terms in the further hearings before the Senate Committee.[7] On page 6 of the report of these hearings, he stated: "In a civil proceeding for preventive relief or for a declaratory judgment, the constitutionality of the election practice could be quickly determined and appropriate relief awarded. Criminal remedies at best come after the harm has been done. Furthermore, we all know that jurors are reluctant—"

In the same report (p. 30), the Attorney General answered the question of a senator in these words:

> "Senator Ervin. The proposed amendments embodies in part 3 and part 4 of S. 83 provide that 'district courts of the United States could exercise the jurisdiction given them without regard to whether the parties aggrieved shall have exhausted any administrative or other remedies that may be provided by law.' I ask you *if the Federal courts could not assume the power under those provisions to determine in the first instance whether a person possessed the qualifications for registering and voting?*
>
> "Mr. Brownell. *No; I think the answer is definitely no on that.*" [Emphasis added.]

At page 10 of House Report 291 of the House of Representatives issued April 1, 1957 (Eighty-fifth Congress, First Session), appears the following statement:

> "The effect of the provisions of the proposed bill * * * is not to expand the rights presently protected, but merely to provide the Attorney General with the right to bring a civil action or all the proper proceedings for *relief to prevent acts* or practices which would give rise to a cause of action under the three existing subsections * * *." [Emphasis added.]

And at page 11 of the same report, the following language is used:

> " * * * The succeeding subsection of the amendment, which is designated subsection (c), does provide a remedy in the form of civil action instituted on the part of the Attorney General to *prevent* an act which would deprive a person of any right or privilege secured by subsection

---

7. Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, Eighty-Fifth Congress, First Session on * * * "Proposals to Secure, Protect

and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States;" February 14 through March 5, 1957.

(a) or (b) of Section 1971 as amended by this bill. The Attorney General would be authorized to institute for the United States * * * a civil action or other proper proceeding for *preventive relief* when any person has engaged or there are reasonable grounds to believe that a person is about to engage in any act * * *." [Emphasis added.]

It appears to me, therefore, that what congressional history there is shows clearly that everyone understood that the Act of Congress was being called upon to pass was one which permitted court orders for preventive relief only.

### IV.

The fundamental error committed by the majority in its determination of the meaning of the statute before us is further established by consideration of the history of the statute, placing it in the proper perspective which belongs to it as an integral part of the aggregation of statutes popularly referred to as the Civil Rights Acts. The Supreme Court has, from time to time, referred to the difficulty of determining the meaning of these statutes, subjected as they were to the process of enactment, subsequent repeal, declared invalidity as being beyond the sanction of the Constitution, and re-enactment. What that court said in Stefanelli v. Minard, 1951, 342 U.S. 117, 121, 72 S.Ct. 118, 120, 96 L.Ed. 138, (dealing, not with the statute before us, but with a companion statute) is illustrative:

"These considerations have informed our construction of the Civil Rights Act. This Act has given rise to differences of application here. Such differences inhere in the attempt to construe the remaining fragments of a comprehensive enactment, dismembered by partial repeal and invalidity, loosely and blindly drafted in the first instance, and drawing on the whole Constitution itself for its scope and meaning. Regardless of differences in particular cases, however, the Court's lodestar of adjudication has been that the statute 'should be construed so as to respect the proper balance between the States and the federal government in law enforcement.' Screws v. United States, 325 U.S. 91, 108, [65 S.Ct. 1031, 89 L.Ed. 1495]. Only last term we reiterated our conviction that the Civil Rights Act 'was not to be used to centralize power so as to upset the federal system.' "

Further background for consideration of the present statute is furnished by the language of the Supreme Court in United States v. Williams et al., 1951, 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758:

"The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post-war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. * * * Although enacted together, they were proposed by different sponsors and hastily adopted. They received little attention in debate. * * * " [8]

---

8. The same theme was followed in Collins v. Hardyman, 341 U.S. 651, 656–657, 71 S.Ct. 937, 939, 95 L.Ed. 1253, where the court was speaking of another of the series of related Acts:
"The Act was among the last of the reconstruction legislation to be based on the 'conquered province' theory which prevailed in Congress for a period following the Civil War. * * *
"The Act, popularly known as the Ku Klux Act, was passed by a partisan vote in a highly inflamed atmosphere. It was preceded by spirited debate which pointed out *its grave character and susceptibility* to abuse, and its defects were soon realized when its execution brought about a severe reaction.
"The provision establishing criminal conspiracies in language indistinguishable from that used to describe civil conspiracies came to judgment in United States v. Harris, 106 U.S. 629, [1 S.Ct. 601, 27 L.Ed. 290]. It was held unconstitutional.

## V.

Contrary to the majority's assertion[9] our research discloses that subsection (a) of Section 1971 of Title 42 U.S.C.A., was first enacted on May 31, 1870, by the 41st Congress, 2nd Session, as Section, Chapter 114, 16 Statutes at L. 140, and appears as Section 1, as follows:

"That all citizens of the United States who are or shall be *otherwise qualified* by law *to vote* at any election *by the people in any State*, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." [Emphasis added.]

This section was clearly directed towards citizens of the United States only,[9a] who are otherwise qualified or registered by the people of the state, or its subdivisions and who were not to be qualified by any federal legislative, judicial, or executive body.

There should not be any issue that Section 1 of the Force Act of May 31, 1870, was so directed, when it is noted that Section 2 of the same Act was directed solely and alone to registration, as witness that Section:

"That if by or under the authority of the constitution or laws of any State, or the laws of any Territory, any act is or shall be required to be done as a prerequisite or qualification for voting, and by such constitution or laws persons or officers are or shall be charged with the performance of duties in furnishing to citizens an opportunity to perform such prerequisite, or to become qualified to vote, it shall be the duty of every such person and officer to give to all citizens of the United States the same and equal opportunity to perform such prerequisite, and to become qualified to vote without distinction of race, color, or previous condition of servitude; and if any such person or officer shall refuse or knowingly omit to give full effect to this section, he shall, for every such offense, forfeit and pay the sum of five hundred dollars to the person aggrieved thereby, to be recovered by an action on the case, with full costs, and such allowance for counsel fees as the court shall deem just, and shall also, for every such offense, be deemed guilty of a misdemeanor, and shall, on conviction thereof, be fined not less than five hundred dollars, or be imprisoned not less than one month and not more than one year, or both, at the discretion of the court." [10]

In a slightly changed form, Section 1 of the Force Act of May 31, 1870, and which is now subsection (a) of § 1971, Title 42, U.S.C.A., appeared in the form

---

This decision was in harmony with that of other important decisions during that period by a Court, every member of which had been appointed by President Lincoln, Grant, Hayes, Garfield or Arthur * *."

9. The Civil Rights Act of September 9, 1957, Public Law 85–315, 85th Congress, 1st Session, amended Section 2004, of Revised Statutes (42 U.S.C.A. § 1971), by adding subsections (a), (b), first part of (c), (d) and what is presently (f), of Title 42 U.S.C.A. Subsection (a) did not change the substantive nature of Section 2004 Revised Statutes (42 U.S.C.A. § 1971) but added a new catch line.

9a. The Slaughter-House Cases, 1873, 16 Wall. 36, 74, 21 L.Ed. 394, clearly pointed out that there was a clear distinction between citizenship of the State and citizenship of the United States with the privileges and immunities clause of the Fourth Amendment being directed solely and alone to those federal rights created by the Constitution of the United States and not to the privileges and immunities arising from the relation of a citizen of his state.

10. There were twenty-three sections enacted on May 31, 1870, which were known as "An act to enforce the Rights of Citi-

of § 2004 of the Revised Statutes, as follows:

"All citizens of the United States who are *otherwise qualified* by law *to vote* at any election *by the people in any State,* Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." . [Emphasis added.]

Also, in slightly changed form, Section 2 of the Force Act of May 31, 1870 appeared as two sections in the Revised Statutes, in the form of Section 2005:

"When, under the authority of the constitution or laws of any State, or the laws of any Territory, any act is required to be done as a prerequisite or qualification for voting, and by such constitution or laws persons or officers are charged with the duty of furnishing to citizens an opportunity to perform such prerequisite, or to become qualified to vote, every such person and officer shall give to all citizens of the United States the same and equal opportunity to perform such prerequisite, and to become qualified to vote."

and Section 2006:

"Every person or officer charged with the duty specified in the preceding section, who refuses or knowingly omits to give full effect to that section, shall forfeit the sum of five hundred dollars to the party aggrieved by such refusal or omission, to be recovered by an action on the case, with costs, and such allowance for counsel fees as the court may deem just."

On September 20, 1893, during the 53rd Congress, first Session, the House of Representatives, in Report No. 18, reported out House Bill No. 2331, which later was enacted by Congress on February 8, 1894, being Chapter 25 of the laws of the 53rd Congress, 2nd Session, which repealed most of the Force Act of May 31, 1870. Here are appropriate excerpts from said House Report, at page 1:

"The bill provided for the repeal of section 2002 of the Revised Statutes of the United States relating to the bringing of armed troops to the place of election, and of Section 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020 relating to the appointment, qualifications, powers, duties and compensation of supervisors of election; and also for the repeal of sections 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, and 2031 relating to the appointment, qualifications, powers, duties, and compensation of special deputy marshals.

"Also for the repeal of sections 5506, 5511, 5512, 5513, 5514, 5515, 5520, 5521, 5522, and 5523 relating to crimes and their punishment; and also a part of section 643 as follows: 'Or is commenced against any officer of the United States on account of any act done under the provisions of Title twenty-six, "The Elective Franchise," or on account of any right, title or authority claimed by such officer or other person under any of the said provisions." [11]

"The appointment of supervisors presumes *something* to supervise and the *right* to supervision. These sections relate to the right of super-

---

zens of the United States to vote in the several States of this Union, and for other Purposes"—many of which, were subsequenty declared unconstitutional, as shown in footnote 11.

11. A. *Sections repealed* as declared unconstitutional under the Fifteen Amendment:
    1. Sec. 3, May 31, 1870—Sec. 2007 and 2008, Revised Statutes—U. S. v. Reese, 1876, 92 U.S. 214, 23 L.Ed. 563.

visors and deputy marshals to supervise the election of Representatives in Congress; and the initial point, therefore, is as to the *right* of the United States to supervise the election of members of Congress, and if the right exists whether it is *proper* for them to do so. * * *

"We notice, first, that 'the times, places and manner of holding elections, etc., is *primarily* confided to' the legislature of each State; *secondarily*, it is given to the Congress.

"The language itself and the arrangement of the two clauses show this: The times, places, and manner, etc., shall be prescribed by the legislature of each State.

"But the Congress may, by law, at any time make or alter, etc.

"The first is original and *primary*, the second is *permissive* and contingent. The legislatures and Congress cannot both have original and primary power to act on the same subject at the same time. Such a conflict would never have been sanctioned. Nor can we believe that men who draughted this section intended to distinguish it from every other in the Constitution in granting the two distinct and separate authorities co-equal power over the same subject at the same time. Nor can we conceive a greater absurdity than the grant of plenary power to the legislatures of the States in the first clause of the section, only to be abrogated and annulled in the second clause of the same section.

"We can not believe that the intelligence which framed that great instrument, careful in avoiding any conflicts that would probably arise between the State and Federal authorities (for that hour was resonant with jealousies of power), deliberately placed this power into two distinct hands to be exercised, it may be, at the same time and in different ways; and it is equally improbable that the power given the legislatures of the States, as the authority best suited in the minds of the makers of the Constitution, to provide 'the times, manner, and places of holding, etc.,' was intended, without reason or cause, to be taken from them and arbitrarily assumed by Congress; and that, too, when there had been no failure on the parts of the States to provide the necessary machinery and no impropriety in the machinery provided. * * *

"With this state of things we find these statutes which are sought to be repealed create officers whose duties it shall be to supervise, scrutinize, and watch every act of the officers of the States. This of itself must create friction, and the history of the country since the enactment of these laws, has demonstrated their unwisdom in this respect. The power to guard, scrutinize, and inspect implies the power to *correct* or *prevent* that which is scrutinized. The power to supervise implies the power to *compel* the doing or to *prevent* the doing of the thing which is the subject of the supervision. How then can the United States, by its supervisors and deputy marshals, *supervise an election under a law which it has not enacted or scrutinize the registration (a condition of suffrage in many of the States)*

2. Sec. 4, May 31, 1870—Sec. 2009, Revised Statutes;—Crim. Sec. 5506, Revised Statutes, U. S. v. Reese, supra.

B. *Sections not* repealed, but declared beyond the reach of the Fifteen Amendment:

3. Sec. 5, May 31, 1870,—Crim. Sec. 5507, Revised Statutes,—U. S. v. Lackey, 1901, 6 Cir., 107 F. 114, certiorari denied, 181 U.S. 621, 21 S.Ct. 925, 45 L.Ed. 1032.

4. Sec. 6, May 31, 1870,—Crim.Sec. 5508, Revised Statutes,—Karem v. United States, 6 Cir., 121 F. 250 (no appeal).

5. Sec. 7, May 31, 1870—Crim. Sec. 5509, Revised Statutes—United States v. Sanges, 1891, 5 Cir., 48 F. 78, affirmed on other grounds, 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed. 445.

*when the right of suffrage emanates from the State itself and the State alone can determine it?* [Emphasis supplied by the Report.] [12]

"This leaves *the right* of suffrage and the conditions of suffrage in the States. By what authority, then, can a Federal officer, by challenge or otherwise at the polls or on registration day, determine the question of suffrage which the Constitution of the United States has left solely to the States to determine?

"Many of these statutes also impose penalties upon the election officers of the States, in the conduct of elections, for a violation of the State laws. Was ever a more monstrous proposition written on the statute books of a free country? The power to make laws is a sovereign power. It carries with it the power to punish for the violation of such laws, but the two powers must be coordinate. The power that creates the law can inflict punishment for its violation, but no power can inflict punishment rightfully for the violation of a law which it never made. To attempt it, as has been done in the past, has resulted only in irritation, contention, and criti-

cism of the government that has proposed it." [Emphasis supplied by the Report.] [13]

It appears, therefore, that Section 1 of the Force Act of May 31, 1870 (Section 2004 of the Revised Statutes) pertaining solely to voting rights was not repealed,[14] but only those sections, i. e., Section 2 of the Force Act of May 31, 1870, or Section 2004 of the Revised Statutes, remain as Section 2004 of the Revised Statutes, and appeared in the United States Code up to September 9, 1957, as Section 1971, of Title 42 U.S. C.A.

Through the heated debates of 1957[15] and 1960[16] the remainder of § 1971, which is now subsection (a) of § 1971 of Title 42, U.S.C.A., remained as originally enacted as Section 2004 of the Revised Statutes.

It was through no accident that Section 2004, Revised Statutes (42 U.S.C.A. § 1971(a)), applying to voting solely, was never repealed, *but Sections 2005 and 2006, Revised Statutes, applying solely to qualifying or registering of voting or voters, were.* The reach of the Fifteenth Amendment[17] was never meant to apply to registration, but was only to protect against denials, not dis-

---

12. Ibid. p. 6.

13. Ibid. p. 7.

14. "Sections 2004, 5507, 5508, and 5509 * * * are all that is left, * * *." United States v. Lackey, 1900, 6 Cir., 99 F. 952, 969, reversed on other grounds, supra (107 F. 114).

15. See House Report 291 of the 85th Congress, 1st Session, of April 1, 1957, U.S.Code Congressional and Administrative News, 1959, p. 1966, see also Hearings before the Subcommittee on Constitutional Rights, United States Senate, 85th Congress, 1st Session, on February 14, 15, 16, 18, 19, 20, 21, 26, 27, 28, March 1, 4, and 5, 1957.

16. See House Report 956, 86th Congress, 1st Session, of August 20, 1959, and also Hearings before the Committee on the Judiciary, United States Senate, 86th Congress, 2nd Session, of March 28, 29, 1960 U.S.Code Congressional and Administrative News, 1960, p. 1925.

17. It comes too late in the day to argue that Section 2004 of the Revised Statutes finds substance in Article 1, Section 4, " * * * Times, Places and Manner of holding Elections * * *," or Section 1 of the Fourteenth Amendment, for " * * * section 2004 be regarded as anything more than a declaration of the effect of the fifteenth amendment, * * *" "the power of Congress to legislate at all upon the subject of voting at purely *state elections* is entirely dependent upon the fifteenth amendment. United States v. Reese, 92 U.S. 214, 23 L.Ed. 563; United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588." [Emphasis added.] Karem v. United States, 1903, 6 Cir., 121 F. 250, 252, 254. The Supreme Court has recently reached the same conclusion that Section 2004 of the Revised Statutes is based solely upon the Fifteenth Amendment, United States v. Raines, 1960, 362 U.S. 17, 25, 80 S.Ct. 519, 4 L.Ed.2d 524.

tinctions, because of race or color, to vote.

VI.

A review of the Supreme Court decisions demonstrates the propriety of the repeal by the Second Session of the 53rd Congress, and lack of constitutional authority here.

In the case of Minor v. Happersett, 1875, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627, a woman sought the privilege to vote under the Fourteenth Amendment,[18] based upon the privileges and immunities clause thereunder, and such contention was rejected by the Supreme Court with the following language (88 U.S. 162):

> *"The Amendment did not add to the privileges and immunities of a citizen. It simply furnished an addi-tional guaranty for the protection of such as he already had. No new voters were necessarily made by it. Indirectly it may have had that effect, because it may have increased the number of citizens entitled to suffrage under the Constitution and laws of the States, but it operates for this purpose, if at all, through the States and the state laws, and not directly upon the citizens. * * *

> "It is clear, therefore, we think, that the Constitution has not added the right of suffrage to the privileges and immunities of citizenship as they existed at the time it was adopted. This makes it proper to inquire whether suffrage was co-extensive with the citizenship of the States at*

The question of any rights, privileges, immunities, or protection to vote at any so-called *federal election* under Article I, Section 4, and Section 1 of the Fourteenth Amendment, never arises in view of the fact that this suit is brought solely under the Fifteenth Amendment and § 2004, of the Revised Statutes, as amended in 1957 and 1960, which are directed to state elections.

The power of Congress to legislate under Article I, Section 4, of the Constitution, "* * * in respect to *congressional elections * * *"* is directed "* * * to protect such elections against *violence* and *fraud* because they are *federal elections* so far as federal officials are thereby directly chosen, it is very obvious that, * * * it furnishes no reason for interference at a purely *state election."* [Emphasis added.] Lackey v. United States, 6 Cir., 107 F. 115, 117–118. This is in agreement with United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 which dealt solely with *fraud* and *violence* and not *racial denials.*

Although what follows in the residue of this note does not relate directly to the Fifteenth Amendment, it is important to bear in mind that the provisions of Section 1 of the Fourteenth do not reach to state elections:

(1) Under the privileges and immunities clause, the "* * * right *to vote* for election of state officers * * * is a right* or privilege of *state citizenship,* not a national citizenship which alone is protected by the privileges and immunities clause." [Emphasis added.] Snow-

den v. Hughes, 1943, 321 U.S. 1. 64 S.Ct. 397, 88 L.Ed. 497. This case was decided subsequently to United States v. Classic, supra, and Mr. Justice Stone was surely aware of the Classic case, which he had previously written, when he wrote the Hughes decision.

(2) The due process clause does not secure political privileges, Snowden v. Hughes, supra.

(3) Under the equal protection clause for "There is nothing to show that the elections voted at were other than *state elections, * * *"* [Emphasis added.] United States v. Cruikshank, 1876, 92 U.S. 542, 556, 23 L.Ed. 588. "The duty of protecting all its citizens in the enjoyment of an equality of rights was originally assumed by the States and it remains there." United States v. Harris, 1883, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290. "The case [United States v. Harris] is clearly distinguished from the case at bar * * * officers, not of the United States, but of the *State,* and that the laws of the *equal protection* of which they were alleged to have been deprived, *were the laws of the State only."* [Emphasis added.] Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. "A construction of the equal protection clause * * * would find a violation of federal right in every departure by *state officers* from *state law * * *"* [Emphasis added.] Snowden v. Hughes, supra.

18. The limitations placed upon the Fourteenth Amendment likewise restrict the Fifteenth Amendment: "The Fifteenth

the time of its adoption. If it was, then it may with force be argued that suffrage was one of the rights which belonged to citizenship, and in the enjoyment of which every citizen must be protected. But if it was not, the contrary may with propriety be assumed. * * *

"Upon an examination of those Constitutions we find that *in no State were all citizens permitted to vote. Each State determined for itself who should have that power.* * * *

"Certainly, if the courts can consider any question settled, this is one. *For nearly ninety years the people have acted upon the idea that the Constitution, when it conferred citizenship, did not necessarily confer the right of suffrage.* If uniform practice, long continued, can settle the construction of so important an instrument as the Constitution of the United States confessedly is, most certainly it has been done here. Our province is to decide what the law is, not to declare what it should be." [Emphasis added.]

The Supreme Court, after reaching this conclusion under the privileges and immunities clause of the Fourteenth Amendment, came to the conclusion under the Fifteenth Amendment, in the case of United States v. Reese, 1876, 92 U.S. 214, 23 L.Ed. 563, where the defendant, Reese, and others, inspectors of elections, were charged with the crime of refusal to accept and count the vote of a person of African descent, at a municipal election under § 2004 Revised Statutes (42 U.S. C.A. § 1971 (a)) that :

"The Fifteenth Amendment does not confer the right of suffrage upon anyone." [19]

The Court (92 U.S. 214, 216) held that § 2004, Revised Statutes (42 U.S. C.A. § 1971(a)):

" * * * simply declares a right, without providing a *punishment* for its violation." [Emphasis added.]

The Court further held that Section 2 of the Force Act of May 31, 1870, dealt with qualifications for registration and as this was a case concerning the receiving and counting of votes, that Section 2 of the Force Act of May 31, 1870, has no application to the case at hand. Here is the language of the Court (92 U.S. 214–216):

"The 2d section (Act of May 31, 1870) provides for the punishment of any officer charged with the duty of furnishing to citizens an opportunity to perform any Act, which, by the Constitution or laws of any State, is made a prerequisite or qualification of voting, who shall omit to give all citizens of the United States the same and equal opportunity to perform such prerequisite, and become qualified on account of race, color or previous condition of servitude, of the applicant. This does not apply to or include the inspectors of an election, whose only duty it is to receive and count the votes of citizens, designated by law as voters, *who have already become qualified to vote at the election."* [Emphasis added.]

In the case of McPherson v. Blacker, 1892, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869, the court had before it the question of whether a certain Michigan Statute, setting up the voting for presidential electors, was in violation of the Fourteenth and Fifteenth Amendments. The Court held that such was not in violation of the

---

Amendment itself has been considered by this court and the same limitations placed upon its provisions." James v. Bowman, 1903, 190 U.S. 127, 23 S.Ct. 678, 47 L. Ed. 979.

19. To the same effect see United States v. Harris, supra, and James V. Bowman, supra.

Fourteenth Amendment nor of the Fifteenth Amendment, using the following language:

"The Fifteenth Amendment exempted citizens of the United States from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude. The right to vote in the States comes from the States, but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States, but the last has been. United States v. Cruikshank, 92 U.S. 542 [,23 L.Ed. 588] (23:588); United States v. Reese, 92 U.S. 214 [,23 L.Ed. 563] (23:563) * * *.

*"The right to vote intended to be protected refers to the right to vote as established by the laws and constitution of the State.* There is no color for the contention that under the amendments every male inhabitant of the State being a citizen of the United States has from the time of his majority a right to vote for presidential electors." [Emphasis added.]

In the case of Karem v. United States, 1903, 121 F. 250, 255 (no appeal noted) [20] the Circuit Court of Appeals for the Sixth Circuit held that:

"The *affirmative right* to vote * * * is still dependent upon and secured by the Constitution and laws of the *state*, the power of the state to prescribe the qualification being limited in only one particular." [Emphasis added.]

The Supreme Court, having concluded that the right to vote emanates from the states and not the federal government, has held that the qualifications and registration of qualified persons also belongs exclusively to the states.

In the case of Pope v. Williams, 1904, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, the appellant, Pope, refused to comply with the Maryland registration procedure and brought action declaring that the refusal of the registration board to register him was in violation of Section 1 of the Fourteenth Amendment. The Court (193 U.S. 621, 632, 633, 24 S.Ct. 573, 575) set aside these contentions and set forth the following as the appropriate requirements of registration:

"The privilege to vote in any State is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. Minor v. Happersett, 21 Wall. 162, [22 L.ed 627]. It may not be refused on account of race, color or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the Federal Constitution. The State might provide that persons of foreign birth could vote without being naturalized, and, as stated by Mr. Chief Justice Waite in Minor v. Happersett, supra, [21 Wall. 162, 22 L.ed 627] such persons were allowed to vote in several of the States upon having declared their intentions to become citizens of the United States. Some States permit women to vote; others refuse them that privilege. A State, so far as the Federal Constitution is concerned, might provide by its own constitution and laws that none but native-born citizens should be permitted to vote, as the Federal Constitution does not confer the right of suffrage upon any one, and the conditions under which that right is to be exercised are matters for the states alone to prescribe, * * *.

20. This case was decided by Judge Lurton and Judge Day, who later became Justices of the Supreme Court.

"*  *  * the elector must be one entitled to vote under the state statute. (Id., Id.) See also Swafford v. Templeton, 185 U.S. 487, 491, [22 Sup.Ct. 783, 46 L.ed. 1005, 1007] *  *  *.

"We are unable to see any violation of the Federal Constitution in the provision of the state statute for the declaration of the intent of a person coming into the State before he can claim the right to be registered as a voter."

The Supreme Court (referring with approval to many of the older cases discussed here) has reached the same conclusion in the recent case of Lassiter v. Northampton County Board of Election Commissioners, 1958, 360 U.S. 45, 79 S. Ct. 985, 3 L.Ed.2d 1072, where the Court (360 U.S. at pp. 50–51, 79 S.Ct. at p. 989) stated:

"The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, Pope v. Williams, 193 U.S. 621, [622], 633; [24 S.Ct. 573, 574] *  *  *."

## VII.

A brief look at what the Congress did in the passage of the Act of 1957 will be found helpful. The Committee of the Judiciary of the House of Representatives, on April 1, 1957, reported [21] HR 6127 favorably to the House for action, and this bill as amended became the Civil Rights Act of 1957. At the same time, the Senate was considering several bills, but finally reported and passed S83, in an amended form. These bills had both been prepared by the administration and had identical sections known as "Part IV—To Provide Means of Further Securing and Protecting the Right to Vote." HR 6127, enacted September 9, 1957, became Public Law 85–315 of the Eighty-fifth Congress, First Session, U. S. Code Congressional and Administrative News, 1957, p. 707 this constituting the amendatory part of Section 2004, Revised Statutes, 42 U.S.C.A. § 1971.[22]

What the Congress did, therefore, had to do only with *voting*. The word "registration" was not used one time in the Act of 1957. It seems clear that the Congress at that time did not think that

---

21. See Report No. 291 of the House of Representatives of the Eighty-fifth Congress, First Session.

22. "PART IV—To Provide Means of Further Securing and Protecting The Right To Vote

"Sec. 131. Section 2004 of the Revised Statutes (42 U.S.C. 1971), is amended as follows:

"(a) Amend the catch line of said section to read, 'Voting rights'.

"(b) Designate its present text with the subsection symbol '(a)'.

"(c) Add, immediately following the present text, four new subsections to read as follows:

" '(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

" '(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for *preventive relief*, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person.

" '(d) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law.' " [Emphasis added.]

It had the right to deal with registration, recognizing that the language of the Fifteenth Amendment did not grant the right of registration to anyone, and concerning itself solely with securing the right to *vote* at state elections against racial denials.

Subsection (b) of the Act of 1957 mentions the word "vote" at least four times, and never hints that registration was within the contemplation of the Congress. The injunctive power given to district courts by Section (c) dealt alone with privileges secured by Sections (a) and (b).

It seems to me, therefore, clear beyond doubt that the language of the 1957 Act and everything which was done in connection with the passing of it, particularly when it is construed in the light of its history, applied to *voting alone* and had no application whatever to *registration*. It is interesting to note that the Government started out in its complaint here asking relief under both the 1957 Act and the 1960 Act. During the course of the battle, the Government mended its hold and placed its reliance solely upon the 1957 Act, and the majority followed that course, and in doing so committed, in my opinion, clear error.

## VIII.

This conclusion is strongly buttressed by the very fact that the Department of Justice pressed for a new Act dealing with registration, and that the Congress passed the 1960 Civil Rights Act. If, as now contended, the powers conferred by the 1957 Act already included jurisdiction in the courts to deal with registration, it was a meaningless act for the Department of Justice to induce Congress to amend the 1957 Act so as to include registration.

The first sentence of the last paragraph of subdivision (e) of § 1971, added by the Congress in 1960, provides:

> "When used *in the subsection*, the word 'vote' includes all action necessary to make a vote effective including but not limited to, registration or other action required by State law prerequisite to voting   *   *   *." [Emphasis added.]

It is plain that the registration provisions had application only to proceedings instituted under subdivision (e). The Government, in its brief, invited [23] this Court to accept this thesis, and the majority did accept it.[24]

Under these circumstances, it is difficult to understand the action of the Department of Justice in presenting, and of Congress in passing, the Civil Rights Act of 1960 if the court was already, by the Act of 1957, given jurisdiction to deal with registrations, as well as with voting.

## IX.

The length of this dissent is justified only by my conviction that the majority opinion strikes at probably the most vital point of the relationship between the State and the Federal Union. Unless the

---

23. Its brief argues:
    "The Civil Rights Act of 1960 adds a new subsection (subsection (e)) to § 1971 of Title 42. The subsection comes into play only upon a finding by the court, in a suit instituted under 42 U.S.C.A. § 1971(c), that any person has been deprived on account of his race or color of any right or privilege secured by subsection (a) and that such deprivation was or is pursuant to a pattern or practice   *   *   *."

24. The United States District Court for the Northern District of Mississippi in United States v. Dogan, 1962, 206 F.Supp. 446, tacitly recognized that subsections (a), (b) and (c) of § 1971 applied solely to voting, and held that the findings pro-

vided in subsection (e) had to precede institution of an action under section (c), this being a part of the language of its opinion:

> "Plaintiff sought to combine in a *single action* with a *single hearing* the action or proceeding contemplated by subsection (c) of § 1971, Title 42 U.S.C. with the proceeding contemplated by subsection (e) of the same statute. It is to be noted, however, that for the proceeding established by subsection (e) there must have been, *before it is instituted*, a finding by the Court that a person has been deprived on account of race or color of a right or privilege secured by sub-section (a) of this same statute." [Emphasis added in part.]

important functions of the elective process reserved by the States in their written compact with the central government are actually to be retained by them, the form of government under which we have lived no longer exists. This aspect of the dual sovereignty cannot be attacked under the theories of some Judges that those portions of the Constitution which deal with such subjects as commerce between the States are outmoded and unrealistic in the changed conditions of the Jet Age. The selection of those who shall govern is fundamental, and the responsibility for this selection was lodged exclusively in the States. Has anybody advanced any argument tending to prove that changing conditions have rendered illogical this important function of government? I have not heard it.

The thoughts emanating from Congress, reproduced at length supra, show definitely that those who had participated in the War Between the States and their sons were, less than three decades after its ending more convinced than ever that this Republic could remain strong only by preserving the rights and powers of the States in the business of the Partnership which has commanded the universal admiration and approval of mankind. The fact is that those who would so debase the states by piling government on top of government in Washington, date themselves as embracing a philosophy of the pre-horse-and-buggy-days.

Witness the expressions of recognized "liberals" on this important subject.

Mr. Justice Douglas, of Connecticut, dissenting in New York v. United States, 326 U.S. 572, 592, 66 S.Ct. 310, 319, 90 L.Ed. 326 (1944), wrote:

"If, * * * any federal tax on any state activity were sustained unless it discriminated against the State, then a constitutional rule would be fashioned which would undermine the sovereignty of the States as it has been understood

throughout our history. Any such change should be accomplished only by constitutional amendment. * *

"Woodrow Wilson stated the starting point for me when he said (Constitutional Government in the United States, pp. 183–184) that 'the States of course possess every power that government has ever anywhere exercised, except only those powers which their own constitutions or the Constitution of the United States explicitly or by plain inference withhold. They are the ordinary governments of the country; the federal government is its instrument only for particular purposes.' * * *

"The notion that the sovereign position of the States must find its protection in the will of a transient majority of Congress is foreign to and a negation of our constitutional system. There will often be vital regional interests represented by no majority in Congress. The Constitution was designed to keep the balance between the States and the Nation outside the field of legislative controversy. * * * [P. 594 [66 S.Ct. p. 320]]

" * * * The Constitution is a compact between sovereigns. * *" [P. 595 [66 S.Ct. p. 320]]

Chief Justice Chase of Ohio, an appointee of President Lincoln, speaking for a court no one of whom came from a Confederate State, used these words in Texas v. White, 1868, 7 Wall. 700, 725, 19 L.Ed. 227:

"And we have already had occasion to remark at this time that 'the people of each state compose a state, having its own government, and endowed with all the functions essential to separate and independent existence,' and that 'without the states in union, there could be no such political body as the United States.' Not only, therefore, can there be no loss of separate and independent autonomy of the states through their

union under the Constitution, but it may not be unreasonably said that the preservation of the states, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible union, composed of indestructible states."

Finally, I think that those of us who feel that we can speak with such infallible assurance in the civil rights field would do well to ponder the words of Mr. Justice Jackson (a "rebel" from upper New York State) in his third Godkin Lecture prepared for delivery to the Harvard Graduate School of Public Administration.[25] From pages 70–72 of this booklet these words are taken:

"The Court has been drawing into the federal system more and more control by federal agencies over local police agencies. I have no doubt that the latter are often guilty of serious invasions of individual rights. But there are more fundamental questions involved in the interpretation of the antiquated, cumbersome, and vague civil rights statutes which give the Department of Justice the right to prosecute state officials. [Such prosecutions are in progress at this moment.] If the Department of Justice must prosecute local officials, the FBI must investigate them, and no local agency which is subject to federal investigation, inspection, and discipline is a free agency. * * * At his trial Hermann Goering, with great candor, related the steps by which the Nazi party obtained complete domination of Germany, and one of the

first was the establishment of the supremacy of the national over the local police authorities. So it was in Russia, and so it has been in every totalitarian state. * * * I believe that the safeguard of our liberty lies in limiting any national policing on investigative organization, first of all to a small number of strictly federal offenses, and secondly to non-political ones * * *.

"But I think in the long run the transgressions of liberty by the Federal Government, with its all-powerful organization, are much more to be feared than those of the several states, which have a greater capacity for self-correction."

These words were written but a few months after he had participated in the Brown decision. Certainly no one would question that he had probably the best chance of any man of his generation to evaluate the American system and compare it with other governmental systems. It is not necessary to conjecture what he would have thought of the unwarranted distortion by the majority of Congress' words here, and of the spectacle of the invasion by the bright young men from the North which is taking place in the South today. A kind providence spared him the pain of watching groups of highly trained representatives of the central government, brought from its seat of power in Washington, backing their ponderous cameras up to country courthouses in the rural sections of the South, photographing the records of the sovereign States and haling their elected officials into court to answer the variegated charges made by men who do not understand—the creature turning upon the creator to rend it—and all with the solemn sanction of Judges who ought to understand.

I respectfully dissent.

**25.** See "The Supreme Court in the American System of Government," Library of Congress catalog card No. 55–9696. In the foreword, it is stated: "Mr. Justice

Jackson died suddenly on October 9, 1954. He had worked for several hours on the third Godkin Lecture the day before his death * * *."